UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ONE AND KEN VALLEY HOUSING        )
GROUP, *et al.*,                  )
                                  )
            Plaintiffs,           )
                                  )
v.                                )        Civ. No. 09-cv-642-B-H
                                  )
MAINE STATE HOUSING               )
AUTHORITY,                        )
                                  )
            Defendant             )

## RECOMMENDED DECISION

The plaintiffs in this action are limited partnerships that own multifamily housing

properties in Bath, Fairfield, Lisbon, Livermore Falls, and Skowhegan.  The plaintiffs and the

defendant, the Maine State Housing Authority,[1] are parties to Housing Assistance Payments

Contracts arising under the federal "Section 8" low-income housing assistance program

administered by the United States Department of Housing and Urban Development ("HUD") and

codified at 42 U.S.C. § 1437f.  Pursuant to these contracts, the Authority agreed to provide

housing assistance payments on behalf of assisted families residing in the plaintiffs' properties

based on certain formulae.  The funding source for these payments is federal and, in conjunction

with the HAP contracts, the Authority executed Annual Contributions Contracts with HUD.  The

plaintiffs have brought suit against the Authority alleging that the Authority's failure since 1995

to automatically increase rental subsidies on an annual basis breached the HAP contracts, as did

certain other actions related to annual adjustments.  The Authority has filed a motion to dismiss

---

[1] The Maine State Housing Authority is "a public body corporate and politic, exercising public and essential governmental functions."  30-A M.R.S. § 4741.  The Authority does not contend that the Eleventh Amendment bars this suit from proceeding in federal court and the fact that the State's coffers are not exposed to liability suggests the reason why.

the action (Doc. No. 14), arguing lack of subject matter jurisdiction in this Court, failure to join an indispensible party (HUD), and failure to state a claim. Should these legal arguments fail, the Authority requests summary judgment that it did not breach the contracts, as a matter of law. (Mot. to Dismiss, Doc. No. 14.) For reasons that follow, I recommend that the Court deny the motion.

## Allegations

There are five plaintiffs: One and Ken Valley Housing Group, Two and Ken Valley Housing Group, Three and Ken Valley Housing Group, Five and Ken Valley Housing Group, and Six and Ken Valley Housing Group ("Plaintiffs"). Plaintiffs own, respectively, the following properties: Island Apartments, a 23-unit property in Fairfield; Lisbon Senior Village Apartments, a 20-unit property in Lisbon; Meadowbrook Apartments, a 24-unit property in Livermore Falls; Sherwood Forest Apartments, a 26-unit property in Skowhegan; and Washington House Apartments, a 53-unit property in Bath. With regard to their respective properties, each plaintiff is a successor in interest to a contract with the Maine State Housing Authority ("Authority") that was originally executed in the 1970s. (Compl. ¶¶ 1, 4-8, 21-24, 30-33, 39-42, 48-51, 57-60.)

The contracts between Plaintiffs and the Authority are "Housing Assistance Payment Contracts," or "HAP Contracts." Plaintiffs explain that the United States Department of Housing and Urban Development ("HUD") is the funding source for the assistance payments they receive under the HAP Contracts; that the Maine State Housing Authority receives payments from HUD pursuant to an Annual Contributions Contract with HUD; and that the Authority "remits" the HUD payments to Plaintiffs (and other property owners participating in the program) pursuant to the HAP Contracts. (Id. ¶ 11.)

As alleged, payments provided to Plaintiffs under the HAP Contracts "are designed to reimburse [them] for the difference between the rent called for under their respective HAP Contracts for each unit ("Contract Rent") and the amount paid by each leasing family." (Id. ¶ 12.)  As alleged, all of Plaintiffs' HAP Contracts "provide that the Plaintiffs are entitled to an automatic annual adjustment to the contract rents," but the Authority "has not made rent adjustments or adjustments to the housing assistance payments . . . since the mid-1990s." (Id. ¶¶ 13-14.)  This failure to adjust contract rents is alleged to constitute a breach by the Authority of the HAP Contracts. (Id. ¶ 14.)

Plaintiffs explain that HUD has, throughout the time period in question, published Automatic Annual Adjustment Factors in the Federal Register that are supposed to be used to adjust contract rents. (Id. ¶ 15.)  However, as alleged, Congress amended the statute governing the Section 8 program in 1994 and "dramatically altered the manner in which contract rents at Section 8 properties would be adjusted in order to reduce expenditures for Section 8 rental assistance." (Id. ¶ 16.)  Pursuant to the "1994 Amendment"[2], rent adjustments would not take place automatically if a property's maximum monthly rent "exceeds the fair market rental for an existing dwelling unit in the market area," unless and "only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(A). (Compl. ¶ 16.)

Based on the 1994 Amendment, HUD issued Notice H 95-12. The Notice required owners to submit an "Estimate of Market Rent by Comparison" on form HUD-92273 at least 60

---

[2] Departments of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, 1995, P.L. No. 103-327, 108 Stat. 2298, 2315 (1994).  See also 42 U.S.C. § 1437f(c)(2)(A).

days prior to a HAP Contract anniversary date if an annual rent adjustment was desired.  (Id. ¶¶ 19-20.)

In addition to placing conditions on the availability of automatic annual adjustments, the 1994 Amendment directed HUD to reduce the annual adjustment factor for properties with rents eligible for adjustment by 0.01 "for any unit occupied by the same family at the time of the last annual rental adjustment."  42 U.S.C. § 1437f(c)(2)(A).  Plaintiffs allege harm resulting from this provision as well, alleging that "[s]ince Notice H 95-12 was issued, [the Authority] has applied the reduced [factors] to non-turnover units at the Plaintiffs' Properties."  (Compl. ¶ 72.)

Plaintiffs complain that, as a consequence of the 1994 Amendment and Notice H 95-12, the Authority denied them automatic annual adjustments for the properties in question.  (Id. ¶¶ 28, 37, 46, 55, 64.)  Plaintiffs allege that the Authority requires a rent comparability study, prepared at an owner's expense, before it will decide whether to increase contract rents and they allege they each commissioned such a study in 2005.  (Id. ¶¶ 74-83.)

### Three Counts

The Authority's related failure to provide automatic annual adjustments is the basis for a breach of contract claim asserted in Count I.  (Id. ¶¶ 65-69.)  The reduction in the adjustment factor by 0.01 for non-turnover units is the basis for a breach of contract claim asserted in Count II.  (Id. ¶¶ 70-73.)  The imposition of a burden on property owners to conduct rent comparability studies is the basis for a breach of contract claim asserted in Count III.  (Id. ¶¶ 74-83.)

### Affidavits and Exhibits

Plaintiffs attach to their complaint five exhibits.  Each exhibit is a HAP Contract for one of the plaintiffs and its respective property.  The terms of the contracts are properly considered for purposes of the motion to dismiss because the authenticity of the contracts is not disputed and

the contracts are incorporated into the complaint and the allegations are expressly connected to, and depend on, the contracts. Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005).

The Authority attaches to its motion an authenticating affidavit from a records custodian and additional copies of the HAP Contracts. (Aff. of Gerrylynn Ricker, Doc. No. 14-1; Exs. A-E, Doc. No. 14-2 through 14-6.) In addition, the Authority includes copies of its Annual Contributions Contract with HUD for each of the properties associated with this suit. (Mot. Exs. F-K, Doc. No. 14-7 through 14-12.) Finally, the Authority attaches a copy of Federal Register volume 40, number 73 (Apr. 15, 1975), Part II, which includes certain definitions and form HAP and Annual Contributions Contracts. (Doc. No. 14-13.)

Plaintiffs attach to their responsive memorandum a declaration authenticating various amendments issued by the Authority in relation to the HAP Contracts. The contract amendments reflect adjustments in contract rents. (Klebanoff Decl. & Ex., Doc. No. 25-1, 25-2.) The same affiant offers a table demonstrating that annual contract rents for each of the properties exceed the commitment amounts stated in the original HAP Contracts. (Klebanoff Decl. ¶¶ 5-6.) Finally, Plaintiffs attach additional pages of the Federal Register introduced by the Authority. (Doc. No. 25-3.)

The final exhibit is a copy of a July 2, 2010, summary judgment decision by Judge Schneider of the Ohio Court of Common Pleas, offered by the Authority in support of the position that its adherence to HUD regulations cannot amount to a breach of contract as a matter of law, based on the contract doctrine of "impossibility." (Doc. No. 29-1.)

## The HAP Contracts

The material provisions of the HAP Contracts, for present purposes, follow.  I have characterized much of the salient language, for simplicity's sake.  Obviously, the contract language speaks for itself and the individual contracts are available on the docket.

1.1(f):  This provision identifies the related "Annual Contributions Contract" between HUD and the Authority by date and by the project number that corresponds with the project housing in question.

1.1(g):  This provision sets the "maximum housing assistance commitment" for the property in question, per year.  The amount indicated corresponds with the amount specified in the corresponding annual contributions contract between HUD and the Authority for the project housing in question.

1.3:  This provision explains that the housing finance agency (HFA), here the Authority, agrees to make assistance payments to the project owner on behalf of families occupying units in the project, in an amount equal to "the difference between the Contract Rents for units leased by Families and that portion of such rents payable by Families as determined by the Owner in accordance with schedules and criteria establish by the Government."

1.5:  This provision states that an "Annual Contribution Contract" (ACC) exists between the HFA and the Government (HUD), and that, pursuant to the ACC, HUD is the source of funds used for housing assistance payments and has approved the instant contract between the HFA and the Owner.  The provision also states that the HFA "pledges" to pay the Owner the annual contributions payable under the ACC.

1.6:  This provision describes the "maximum housing assistance commitment" and the "project account."  It states that the HFA "shall not be obligated to make and shall not make any

housing assistance payments . . . in excess of the amount per annum stated in Section 1.1g," that

there is a segregated account established for the project in question, and that "the maximum total

annual housing assistance payments for any Fiscal Year may exceed the maximum amount . . . to

cover increases in Contract Rents or decreases in Family Incomes . . . ."

    1.9  <u>RENT ADJUSTMENTS</u>.  This provision is at the heart of Plaintiffs' claims.  The

three most salient subsections are as follows:

    a.  <u>Funding of Adjustments</u>.  Housing assistance payments will be made in
increased amounts commensurate with Contract Rent adjustments under this
Section up to the maximum amount authorized under Section 1.6 of this Contract.

    b.  <u>Automatic Annual Adjustments</u>.

    (1)  Automatic Annual Adjustment Factors will be determined by the
Government at least annually;  interim revisions may be made as market
conditions warrant.  Such Factors and the basis for their determination will be
published in the Federal Register.  . . .

    (2)  On each anniversary date of the Contract, the Contract Rents shall be
adjusted by applying the applicable Automatic Annual Adjustment Factor most
recently published by the Government.  Contract Rents may be adjusted upward
or downward, as may be appropriate;  however, in no case shall the adjusted
Contract Rents be less than the Contract Rents on the effective date of the
Contract.

    . . .

    d.  <u>Overall Limitation</u>.  Notwithstanding any other provisions of this Contract,
adjustments as provided in this Section shall not result in material differences
between the rents charged for assisted and comparable unassisted units, as
determined by the HFA . . .;  provided that this limitation shall not be construed to
prohibit differences in rents between assisted and comparable unassisted units to
the extent that such differences may have existed with respect to the Initial
Contract Rents.

    . . .

Plaintiffs offer certain supplemental material concerning the HAP Contracts through the

Declaration of Steven Klebanoff (Doc. No. 25-1).  He attaches "a selection of amendments" to

the HAP Contracts that demonstrate amended rents far in excess of the contract rents approved

when the HAP Contracts were first executed in the 1970s. (Doc. No. 25-2.)

## The Section 8 Housing Program

Plaintiffs' complaint describes the development of the Section 8 housing program.

Plaintiffs' claims are modeled on similar claims brought by other owners across the country,

many of whom have been able to file their actions in the Court of Federal Claims due to the fact

that their HAP contracts were executed with HUD itself, rather than a local housing authority.

The Court of Federal Claims has described the statutory backdrop as follows:

> The Section 8 housing program, adopted by Congress in 1974, established a new
> federal program for subsidizing low-income housing. Pursuant to the new
> program, HUD entered into contracts with private landlords that established an
> agreed "maximum monthly rent," which would be supplemented by HUD's
> making "assistance payments" to the landlord. *See* 42 U.S.C. §§ 1437a(a),
> 1437f(c)(3) (1976). The maximum monthly rent was to be based upon "the fair
> market rental" value of the dwelling unit, allowing for some increase over the
> market rate to compensate for the expenses attendant to complying with the
> administrative and regulatory requirements of the Section 8 program. *See* 42
> U.S.C. § 1437f(c)(1). As originally enacted in 1974, the statute required HUD to
> adjust the maximum monthly rents on at least an annual basis. *See* 42 U.S.C. §
> 1437f(c)(2)(A) (1976). The implementing regulations contained a subsection
> entitled "Automatic Annual Adjustment of Contract Rents," providing that
> "[u]pon request from the owner to the contract administrator, contract rents will
> be adjusted on the anniversary date of the contract in accordance with 24 C.F.R.
> Part 888." 24 C.F.R. § 880.609(a) (1980). Adjustments to contract rents were
> subject to an "overall limitation," such that "[a]djustments in the maximum rents
> as hereinbefore provided shall not result in material differences between the rents
> charged for assisted and comparable unassisted units, as determined by the
> Secretary." 42 U.S.C. § 1437f(c)(2)(C) (1976) (which text appears in similar
> form in the initial sentence of Section 1437f(c)(2)(C) as amended to date).

Haddon Hous. Assocs., LLC v. United States, 92 Fed. Cl. 8, 11 (2010).

> In the early 1980s, HUD began to conduct "comparability studies" in those
> markets in which it believed automatic adjustments to assisted units had resulted
> in materially higher rents than those for comparable unassisted units. *See*
> *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 14, 113 S. Ct. 1898, 123 L. Ed. 2d
> 572 (1993). HUD would select three to five unassisted units it considered

comparable to a given assisted unit and use the rents of the former to test whether rents for the latter should be capped. *Id.* After landlords successfully contested this action by HUD in a court of appeals, *see Rainier View Assoc. v. United States,* 848 F.2d 988 (9th Cir. 1988), Congress enacted an amendment to the Housing Act explicitly authorizing HUD to use comparability studies prospectively to limit automatic annual adjustment factor increases. Department of Housing and Urban Development Reform Act of 1989, Pub. L. No. 101-235, § 801(c), 103 Stat. 1987, 2058 (1989). The Supreme Court subsequently held that the 1989 amendment did not constitute a breach of the owners' HAP contracts because those contracts authorized HUD to conduct comparability studies and use those studies to limit increases in rent adjustments. *Cisneros,* 508 U.S. at 21.

Id. at 12.

In 1994, Congress further amended the Housing Act to place on owners the obligation to provide comparability studies, thereby in effect requiring owners to shoulder the burden of proving that the adjusted rent for their units would not exceed the rent for comparable unassisted units. *See* Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315 (1994) (amending 42 U.S.C. § 1437f(c)(2)(A)). In addition, the 1994 amendments reduced by one percent the annual adjustment factor for units occupied by a tenant holding over from the previous year. *See* 42 U.S.C. § 1437f(c)(2)(A).

Id. (footnote omitted).

As part of its effort to implement the 1994 amendments, HUD issued guidance in the form of "Notice 95-12" on March 7, 1995. (HUD Directive 95-12 on the Annual Adjustment Factor Rent Increase Requirements Pursuant to the Housing Appropriations Act of 1995 (Mar. 7, 1995)) ("Notice 95-12"). The Notice provided that to receive a rent increase, an owner had to submit a study of the rent of comparable, unassisted units at least 60 days prior to the HAP contract anniversary date. . . .

Id. at 12-13 (footnote and citation of court record omitted).

Additional background is available in Cisneros v. Alpine Ridge Group, though in that

case the Supreme Court held only that assistance contracts do not prohibit HUD from conducting

its own rent comparability studies to impose a cap on annual adjustments. 508 U.S. 10 (1993).

Additionally, in Cuyahoga Metropolitan Housing Authority v. The United States, the Court of

Federal Claims ruled that the United States was liable for breach of contract on contract claims

brought by a local housing authority that were analogous to the claims presented here. 57 Fed. Cl. 751 (2003).

DISCUSSION

Plaintiffs allege that the Court has jurisdiction in this matter because the case presents a federal question, citing 28 U.S.C. § 1331. The Authority challenges this allegation. In addition, the Authority argues that HUD is an indispensible party and requests dismissal based on Plaintiffs' failure (or inability) to pursue a claim against HUD. Finally, the Authority offers certain merits-based challenges to Plaintiffs' suit.

**A.     Subject Matter Jurisdiction**

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, a party may plead the defense of lack of subject matter jurisdiction by motion to dismiss, prior to filing an answer to a complaint. The court is free to consider extrinsic evidence in determining subject matter jurisdiction, whether that evidence is introduced by the plaintiff or by the defendant, and the burden falls on the plaintiff to prove that subject matter jurisdiction exists. Aversa v. United States, 99 F.3d 1200, 1209-10 (1st Cir. 1996). Ordinarily, a court should resolve challenges to its exercise of jurisdiction over the subject matter of a case before proceeding to address the merits. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998); Donahue v. City of Boston, 304 F.3d 110, 117 (1st Cir. 2002).

The alleged basis for this Court's jurisdiction is 28 U.S.C. § 1331, which grants federal district courts original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." According to the Authority, federal question jurisdiction does not exist in this case because Plaintiffs' claims are based on the provisions of a contract to which the federal government is not a party, even if that contract is designed to implement a federal

program.  (Mot. to Dismiss at 8-9.)  The Authority's argument is drawn from two opinions

quoted in their memorandum:  1610 Corp. v. Kemp, 753 F. Supp. 1026 (D. Mass. 1991), and

Marvin Gardens, L.P. v. Housing Authority of St. Louis County, 782 F. Supp. 454 (E.D. Mo.

1992).

The First Circuit recently explained that there are two categories of cases that implicate

federal question jurisdiction, one involving federal causes of action and another involving state

law causes with significant disputes on federal questions embedded in them.

> The first (and most familiar) category involves direct federal questions;  that is,
> suits in which the plaintiff pleads a cause of action that has its roots in federal law
> (say, a claim premised on the United States Constitution or on a federal statute).
> *See, e.g., Am. Well Works Co. v. Layne & Bowler Co.*, 241 U.S. 257, 260, 36 S.
> Ct. 585, 60 L. Ed. 987 (1916) (Holmes, J.);  *Almond v. Capital Props., Inc.*, 212
> F.3d 20, 23 (1st Cir. 2000).  The second (and far more rare) category involves
> embedded federal questions;  that is, suits in which the plaintiff pleads a state-law
> cause of action, but that cause of action "necessarily raise[s] a stated federal issue,
> actually disputed and substantial, which a federal forum may entertain without
> disturbing any congressionally approved balance of federal and state judicial
> responsibilities." *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545
> U.S. 308, 314 (2005);  *accord Smith v. Kan. City Title & Trust Co.*, 255 U.S. 180,
> 201-02, 41 S. Ct. 243, 65 L. Ed. 577 (1921).

R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Envtl. Mgmt., 585 F.3d 42, 48 (1st Cir. 2009).

In their objection to the motion, Plaintiffs cite Rhode Island Fishermen's Alliance, the

leading case in this circuit, quoted above, and they take the position that their case falls into the

second category because their contract claims "implicate significant federal issues." (Pls.' Obj. at

9, Doc. No. 25, quoting Grable.)  Plaintiffs maintain that a federal question must necessarily be

resolved here because "the entire dispute . . . takes place in the context of an extensive Federal

program." (Pls.' Objection at 12.)  They also note that the contract in question is drawn on a

form generated by HUD.  (Id. at 12 n.6.)  They also emphasize that the federal question must be

central to a determination of their claim because the case illustrates "how these federal

11

provisions [the 1994 Amendment and Notice H 95-12] caused [the Authority] to breach Plaintiffs' HAP Contracts." (Id. at 12-13; see also id. at 12 n.5 (noting that the alleged breach "was caused by federal law" (emphasis in original)).) Plaintiffs cite one case on point, in which the District of Illinois ruled that it had federal question jurisdiction in a case like this one "because the case arises under Section 8 of the United States Housing Act of 1937," without engaging in any further analysis. Greenleaf Ltd. P'ship v. Ill. Hous. Dev. Auth., Case No. 08 cv 2480, 2009 U.S. Dist. Lexis 119375, *3-4 (N.D. Ill. Dec. 23, 2009). In a parallel proceeding before Judge Singal, the plaintiffs therein additionally cite three cases in which federal question jurisdiction was found to exist in other cases brought by housing providers in the Section 8 context: Katz v. Cisneros, 16 F.3d 1204 (Fed. Cir. 1994), Atlantic Terrace L.P. v. Cisneros, Civ. No. 94-0051 (JHG), 1994 U.S. Dist. Lexis 7183, 1994 WL 248239 (D. D.C. May 23, 1994), and New York v. Rapgal Associates, 703 F. Supp. 284 (S.D.N.Y. 1989).[3] (See Pl.'s Opp'n Mem. in Mack Bros. v. Me. State Hous. Auth., Civ. No. 10-87-P-S, Doc. No. 25 at 12.)

Plaintiffs' arguments, like the District of Illinois assessment of the issue, have the monopoly on common sense. In the words of Justice Cardozo:

What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of causation. . . . Instead, there has been a selective process which picks the substantial causes out of the web and lays the other ones aside.

---

[3]  The Atlantic Terrace and Rapgal cases are good persuasive authority for Plaintiffs' position. See Atlantic Terrace, 1994 U.S. Dist. Lexis 7183, *19, 1994 WL 248239, *6 (involving rent adjustments under HAP contract, where HUD conducted a local survey and directed local authority to reduce rents at plaintiff's project and recover past overpayments; finding that HAP contract claim against the local authority was within the scope of federal question jurisdiction); New York v. Rapgal Assocs., 703 F. Supp. at 286-87 (involving another dispute that would not have arisen but for the Section 8 program, but a dispute arising from a bidding process with the City of New York related to the City's local regulatory function rather than a HAP contract with the City, but finding federal question jurisdiction nonetheless, based on City's partnering relationship with the federal government under the Section 8 program); cf. Katz v. Cisneros, 16 F.3d at 1207-08 (involving litigation arising out of the Section 8 program, but a direct claim against HUD based on a regulatory interpretation; held that federal question jurisdiction existed in district court rather than court of claims because prospective equitable relief was sought and finding waiver of sovereign immunity under the Administrative Procedures Act).

Gully v. First Nat'l Bank, 299 U.S. 109, 117-118 (1936).

The next three sections of this discussion proceed from the premise that this case lies in the second of the two federal question categories described in Rhode Island Fishermen's Alliance, entertaining the assumption that this is a case having only "state law claims," but involving federal questions. Plaintiffs have not attempted to argue that their contract claims are impliedly recognized by Congress given the structure of Section 1437f, which would seem to be a predicate to placing this case in the first category. Analyzing this case in the second category is not as predictable as one might expect. This is due, in part, to the fact that this is not so much a case involving a federal issue embedded in a state law claim, as it is a contract dispute embedded in a federal program. However, on the whole, the category-two analysis reliably indicates that federal question jurisdiction is appropriate in this particular case. If the fit is not perfect, it is likely because the Supreme Court has endorsed a "sensitive" and "contextual enquiry" that has eschewed any bright-line rule. The absence of a perfect fit in either analytical category is, therefore, not dispositive. Grable, 545 U.S. 317-18; Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 810, 814 n.12 (1986).

Although the Section 8 program does not announce a federal cause of action for breach of a HAP contract, federal law is the driving force behind the Authority's alleged breach. Although it would be more accurate to state that federal law pervades the case rather than that a discrete question of federal law is embedded within it, the alleged breach in this contract dispute would not have arisen but for the 1994 Amendment to federal law. This gives rise to federal question jurisdiction under 28 U.S.C. § 1331.

1. *Embedded federal question*

Under the second category, the first inquiry is whether the plaintiff's complaint presents, within its four corners, "a state-law cause of action that contains an embedded question of federal law that is both substantial and disputed." R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Envtl. Mgmt., 585 F.3d at 48. If it does, then the Court must consider if the federal question "is one that a federal court may entertain without impermissibly tilting the balance of federal and state judicial responsibilities." Id.

For a state law cause of action to contain an embedded federal question, resolution of the federal question must be necessary to a determination of the plaintiff's cause. Id. at 49. The gist of Plaintiffs' suit is that the terms of their HAP Contracts override subsequent statutory amendments to the Section 8 program, so that the Authority's compliance with the Amendments and related Notice gives rise to breach. Their discussion of the merits relates good authority for the proposition that the 1994 Amendments give rise to a breach of contract when the HAP contracts in question are contracts entered into by HUD itself. (Pls.' Obj. at 28, citing Cuyahoga Metro. Hous. Auth. v. United States, 57 Fed. Cl. 751 (2003).) On the other hand, the Authority argues in its discussion of the merits that it was legally obliged to heed Congress's 1994 Amendment to the Section 8 program, and HUD's subsequent Notice. In its view, because federal law and regulations required it to act as it did,[4] either the 1994 Amendment and subsequent notice are incorporated into the existing terms of the HAP Contracts or else they render the requested performance impossible, thereby precluding a finding of breach. (Def.'s Reply Mem. at 2-4.) Ultimately, if there is subject matter jurisdiction, the Court will need to

---

[4] As of yet, Plaintiffs have not contended that the Authority could have flouted the 1994 Amendment or HUD's related Notice.

determine whether or not the HAP Contracts were breached on largely undisputed facts. Seemingly, this question will turn on whether or not the 1994 Amendment and HUD's Notice are consistent with the terms of the Contract and, if not, whether the common law affords any remedy for breach of contract. Will that be state or federal common law? The parties have not briefed that issue. The fact that the parties are discussing subject matter jurisdiction in terms of the second category suggests that they perceive of state law as supplying the rule of decision.

This case is not one in which a federal question is merely present within a state law dispute. More accurately, this is a contract dispute embedded in a federal program. The existence of the contracts is a function of a federal program. The terms of the contracts are set by the federal program. As Plaintiffs say, the dispute would not exist but for the parties' mutual participation in the federal Section 8 housing program. This alone may not be sufficient to support jurisdiction. However, in addition to these factors, the alleged breach was caused by congressional amendment of the underlying federal statute. This dispute would not have arisen but for the Authority's obeisance to the 1994 Amendment and the related notices issued by HUD.[5] Federal law both encapsulates and is embedded within the parties' dispute.

---

[5]    This last factor distinguishes the precedent relied on by the Authority. In 1610 Corporation, the district court concluded that the only federal court with jurisdiction over a similar dispute was the Court of Federal Claims. However, in that case the plaintiff sued on a HAP contract based on an alleged breach having nothing to do with a federal statute, which the Court considered important to its finding that it lacked jurisdiction over the claim. 753 F. Supp. at 1031-32 ("HUD did not base this adjustment on a federal statute or regulation, but rather, on a contract provision, which according to HUD, allows for such adjustments."). In the other case, Marvin Gardens, the district court did not ultimately reach the issue because the defendant authority brought a third-party claim against HUD and the district court, on its own motion, transferred that claim to the Court of Federal Claims based on the Tucker Act, and sent the original claim between the owner and the local housing authority along with it because it was said to be within the supplemental jurisdiction of the Court of Claims. 782 F. Supp. at 456.

The fact that federal law compels the alleged breach also distinguishes this case from others that align with 1610 Corporation and Marvin Gardens. See, e.g., North Jefferson Square Associates, L.P. v. Virginia Housing Development, 32 Fed. Appx. 684 (4th Cir. 2002) (involving claim tied to HAP contract and mortgage deed between owner and local housing authority, but not a breach set in motion by federal law).

2.      *Substantial dispute*

Even where a federal question is embedded in a state law claim, federal jurisdiction does not exist absent a substantial dispute concerning the federal law issue.  "This requirement ensures that there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum.'"  <u>Id.</u> (quoting <u>Grable</u>, 545 U.S. at 313).  Although this case is pervaded by federal law, it is not as clear that the parties have identified exactly what they are in dispute about.  One reading of the parties' pleadings and papers suggests that they actually agree that the Authority was bound to follow the 1994 Amendment.  What they clearly disagree about is the impact the Authority's compliance has on the breach of contract claims.  Theoretically, this might suggest that the substantial dispute at the heart of this litigation is about the common law of contracts rather than a uniquely federal legal issue.  Nevertheless, it defies common sense to think of this case as involving anything other than a substantial federal concern that implicates "the advantages thought to be inherent in a federal forum."  <u>Grable</u>, 545 U.S. at 313.  Federal law is essential to this dispute whether federal law or state law governs the question of breach.  As such, it can only be said that a substantial federal question, or concern, is presented.

3.      *Federal-state balance*

Where federal issues are embedded in state claims, the final concern is whether a federal court's exercise of jurisdiction will "disturb[] any congressionally approved balance of federal and state judicial responsibilities."  <u>Grable</u>, 545 U.S. at 314.  The Section 8 housing statute does not speak to the balance between federal and state judicial responsibilities.  However, there is nothing to suggest that an exercise of federal jurisdiction would disrupt any congressionally-recognized balance, or presumptive congressional understanding, about where a given type of litigation belongs.  For example, this case is unlike <u>Merrell Dow Pharmaceuticals, Inc. v.</u>

Thompson, 478 U.S. 804 (1986), where the exercise of federal jurisdiction over a product liability claim between non-diverse parties would have gone against the basic understanding that the right to a remedy in such a case depends on state law, notwithstanding the fact that violation of a federal statute was alleged to demonstrate breach of a legal duty for purposes of a state law negligence claim. See id. at 813-14; Grable, 545 U.S. at 317-319 (discusses Merrell Dow). Here, in comparison, the contract rights at issue arise from a federal program and depend on contract language prescribed by the federal government in order to implement that program. Additionally, the alleged breach flows from congressional amendment of the program. Congress would not be surprised that such a contract claim would be brought and heard in a federal forum, even if it cannot ultimately be said that Congress impliedly recognized a private federal remedy for breach of a HAP contract between an owner and a non-diverse public housing agency. Compare Merrell Dow, 478 U.S. at 810-12. To paraphrase the Grable Court:

> [J]urisdiction over actions like [Plaintiffs'] would not materially affect, or threaten to affect, the normal currents of litigation. Given the absence of threatening structural consequences and the clear interest [HUD], [public housing agencies], and [owners] have in the availability of a federal forum, there is no good reason to shirk from federal jurisdiction over the dispositive and contested federal issue at the heart of the [HAP Contract] claim[s].

Grable, 545 U.S. at 319-20.

4.    *Federal question jurisdiction is proper*

For the reasons set forth above, federal question jurisdiction exists under 28 U.S.C. § 1331 and the Authority's motion to dismiss for lack of subject matter jurisdiction should be denied.

**B.     Failure to Join**

Alternatively, the Authority argues that dismissal is in order under Rules 12(b)(7) and 19 because Plaintiffs did not include a claim against HUD in this action.  (Mot. to Dismiss at 5-8.) According to the Authority:  "Although disguised as a breach of contract action, the Complaint in fact challenges the federal regulations on which the contract rent increase may be calculated, and it is thus essentially an action against HUD challenging those regulations."  (<u>Id.</u> at 6.)

Pursuant to Rule 19, a person is a "required party" who must be joined, if "complete relief among existing parties" cannot be given in the person's absence or the person "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:  . . . impair or impede the person's ability to protect his interest; or . . . leave an existing party subject to a substantial risk of double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a).  If a person is a required party but cannot be joined, then "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."  Fed. R. Civ. P. 19(b). The Rule provides four factors that govern this question:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>
> (2) the extent to which any prejudice could be lessened or avoided by:
>
>> (A) protective provisions in the judgment;
>> (B) shaping the relief; or
>> (C) other measures;
>
> (3) whether a judgment rendered in the person's absence would be adequate; and
>
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Id.  As it sounds, the Rule 19 issue "involve[s] the balancing of competing interests and must be steeped in pragmatic considerations."  Travelers Indem. Co. v. Dingwell, 884 F.2d 629, 635 (1st Cir. 1989) (internal quotation marks omitted).

> In proceeding with its inquiry into both necessity and indispensability, a district court should keep in mind the policies that underlie Rule 19, "including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them."

Picciotto v. Cont'l Cas. Co., 512 F.3d 9, 15-16 (1st Cir. 2008) (quoting Acton Co. v. Bachman Foods, Inc., 668 F.2d 76, 78 (1st Cir. 1982).).

According to the Authority, HUD's interest (or that of the United States) is in jeopardy here because this litigation "has implications for the national fisc."  (Mot. to Dismiss at 7.)  The Authority does not articulate how proceeding in this matter would result in harm to the Authority, but it does cite a case in which a district court explained that a local housing authority could be placed at risk of incurring inconsistent obligations—one owed to the court and the other owed to HUD.  (Id. at 7 n.6, citing Idaho AIDS Found., Inc. v. Idaho Hous. & Fin. Assoc., 422 F. Supp. 2d 1193, 1208 (D. Idaho 2006) (concluding that HUD was a necessary party to claims against local housing authority that arose based on its compliance with a HUD directive, albeit in the context of a suit that included a viable Fair Housing Act discrimination claim and a Rehabilitation Act claim seeking equitable relief).)

In opposition, Plaintiffs assert that dismissal based on failure to join is disfavored.  They also emphasize that they are not seeking to invalidate federal law, only to enforce the HAP Contracts as written.  They argue that HUD cannot be considered a necessary or required party to the contract dispute, because HUD is not a party to the HAP Contracts.  (Pls.' Obj. at 16-17.)

They also assert that the Authority can file an action against HUD in the Court of Federal Claims in the event there is a need to seek reimbursement or indemnification from HUD. (Id. at 18 n.16.)

A motion to dismiss for failure to join a required party is based on Rule 12(b)(7). The Rule 12(b)(7) movant bears the burden of showing why an absent person is required under Rule 19(a) and, if the person is required, why dismissal would be called for under Rule 19(b). OneBeacon Am. Ins. Co. v. Elwell, Civ. No. 09-342-P-H, 2009 U.S. Dist. Lexis 117402, *4, 2009 WL 4910056, *1 (D. Me. Dec. 13, 2009) (Rich, Mag. J., Report and Recommended Dec. on Mot. to Dismiss), adopted (Jan. 6, 2010).

The Authority's effort to scuttle Plaintiffs' attempt at a contract remedy based on Rule 19 is unconvincing. When it comes to joinder of parties and the configuration of a litigation involving interrelated contractual obligations and privity of contract problems, the possibilities may be greater than they seem. For example, it may be possible for the Authority to join as a party plaintiff in a case against the United States, if only the action were filed in the Court of Federal Claims. See Haddon Hous. Assocs., 92 Fed. Cl. at 14-17. Plaintiffs cannot sue HUD directly in the Court of Federal Claims, at least not if their contract claims rest exclusively on their HAP contracts with the Authority. Brown Park Estates-Fairfield Dev. Co. v. United States, 34 Fed. Cl. 464, 467 (1995). For whatever reason, the Authority prefers to undermine Plaintiffs' effort at a contract remedy by invoking technical rules of pleading in order to leverage a common law privity of contract problem to Plaintiffs' detriment. Yet privity of contract cuts both ways. Plaintiffs are suing on a contract that HUD is not a party to. This makes it more difficult to cast HUD as an indispensible party.

It is beyond the scope of the pending motion for the Court to definitively resolve whether or not it would be more practical for Plaintiffs and the Authority to be co-plaintiffs in an action against the United States in the Court of Federal Claims. However, it suffices for present purposes to state that the Authority's ability to protect itself from prejudice is greater than what the Authority suggests in its motion, which at the very least demonstrates a failure on its part to carry its burden of demonstrating prejudice based on the position that the United States cannot be joined in the litigation filed in this Court. The Authority's disinclination to facilitate a recovery against HUD does not compel dismissal in "equity and good conscience." Fed. R. Civ. P. 19(b). The Authority may well agree with Congress that automatic annual adjustments that perpetuate above market rents place an unacceptable burden on the federal treasury, but that political question does not compel dismissal on a pleading technicality. In other words, even assuming that the United States is a "required" party under Rule 19(a), the Authority fails to demonstrate with its existing arguments that the failure to join the United States (or the impossibility of successfully joining the United States)[6] as a defendant in this proceeding means that the action

---

[6]    As to this question, sovereign immunity deprives a court of subject-matter jurisdiction and general jurisdictional statutes like 28 U.S.C. § 1331 will not suffice to waive the Government's sovereign immunity. Additionally, the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims where contract claims are pressed against the United States that involves greater than $10,000. Charles v. Rice, 28 F.3d 1312, 1321 (1st Cir. 1994); see also Normandy Apts., Ltd. v. United States HUD, 554 F.3d 1290, 1295-96 (10th Cir. 2009) (concluding that claim against HUD to prevent HUD from abating subsidy payments was injunctive in nature and not within Court of Federal Claims' exclusive jurisdiction, but not involving claims for contract damages as the instant case is configured); Capitol Park Ltd. Dividend Hous. Ass'n v. Jackson, 202 Fed. Appx. 873, 879 (6th Cir. 2006) (not recommended for full-text publ'n) (affirming district court's dismissal of contract claims against HUD); Vill. W. Assocs. v. R.I. Hous. and Mortg. Fin. Corp., 618 F. Supp. 2d 134, 136-141 (D. R.I. 2009) (dismissing local housing authority's third-party claims against HUD where authority was sued by owner on HAP contract); Normandy Apts., Ltd. v. United States HUD, No. Civ-07-1161-R, 2007 U.S. Dist. Lexis 81330, *3-6, 2007 WL 3232610, *2-3 (W.D. Okla. Nov. 1, 2007) (dismissing claims based on HAP contracts executed with HUD).

        Although the following cases citations do not include a discussion of Rule 19, they are cases where the District Court has continued to exercise jurisdiction over HAP contract claims against a local housing authority after dismissing the local authority's third-party claims against HUD. First is Greenleaf Limited Partnership v. Illinois Housing Development Authority, Case No. 08 cv 2480, 2009 U.S. Dist. Lexis 82128 (July 7, 2009) (order denying local authority's motion for entry of Rule 54(b) judgment). See also id., 2009 U.S. Dist. Lexis 13519, 2009 WL 449100 (Feb. 23, 2009) (order granting HUD's motion for summary judgment on jurisdictional grounds); see also 2009 U.S. Dist. Lexis 119375, *3-4 (Dec. 23, 2009) (finding that federal question jurisdiction existed over claims

should be dismissed "in equity and good conscience" under Rule 19(b).[7]  For this reason, the motion to dismiss pursuant to Rule 12(b)(7) should be denied.

## C.  Failure to State a Claim

Rule 12(b)(6) provides that a complaint can be dismissed for "failure to state a claim upon which relief can be granted."  In deciding a motion brought on this ground, the court accepts as true the factual allegations of the complaint, draws all reasonable inferences in favor of the plaintiff that are supported by the factual allegations, and determines whether the complaint, so read, sets forth a plausible basis for recovery.  If it does, the motion is denied. Vernet v. Serrano-Torres, 566 F.3d 254, 258 (1st Cir. 2009).

According to the Authority, a review of the complaint and the material portions of the HAP Contracts will demonstrate that there is no breach.  The Authority's motion references sections 1.1(f), 1.1(g), 1.6(a), and 1.9(a).  (Mot. to Dismiss at 10-11.)  I discuss each HAP Contract provision in turn.

---

between owner and local authority "because the case arises under Section 8 of the United States Housing Act of 1937," without engaging in any further analysis).  The Greenleaf case is still active on the court's docket and summary judgment orders have been issued therein.  2010 U.S. Dist. Lexis 104575 (N.D. Ill. Sept. 30, 2010) (addressing significance of HAP contract's "overall limitation provision" in relation to damages issue); 2010 U.S. Dist. Lexis 104574 (Sept. 30, 2010) (addressing liability issues and statute of limitations issue).  As the string cite in the preceding paragraph indicates, a similar proceeding was transpiring in the District of Rhode Island, though the court's electronic docket reflects that the case terminated in May 2010 following a joint stipulation of dismissal.  The District Court for the District of South Dakota has a similar proceeding before it.  Cathedral Square Partners L. P. v. S.D. Hous. Dev. Auth., 679 F. Supp. 2d 1034 (D. S.D. 2009).  It has summary judgment motions on liability pending on the docket at this time.  The District Court for the District of Columbia has also exercised subject matter jurisdiction over a claim of this kind, though not so recently.  Atl. Terrace Ltd. P'ship v. Cisneros, No. 94-0051 (JHG), 1994 U.S. Dist. Lexis 7183, *19-20, 1994 WL 248239, *6-7 (D. D.C. May 23, 1994) (discussing subject matter jurisdiction where defendants included both HUD and the local housing authority, but not addressing HUD's sovereign immunity defense).

[7]  In one of the cases chiefly relied on by the Authority, the district court transferred the case to the Court of Federal Claims, although in that case the plaintiffs included HUD as a defendant.  The court concluded that transfer was in the interest of justice and preferable to dismissal based on HUD's motion to dismiss on jurisdictional/sovereign immunity grounds.  1610 Corp., 753 F. Supp. at 1033.

*1. Section 1.1(f)*

The Authority references section 1.1(f) of the HAP Contracts, which states that there is a specific Annual Contributions Contract between the Authority and HUD that is "applicable to this Contract." (See, e.g., Mot. Ex. A, § 1.1(f), Doc. No. 14-2.) The Annual Contributions Contracts are, according to the Authority, the source of its authority to enter into the HAP Contract with Plaintiffs. (Mot. at 9.) This is accurate,[8] as the Annual Contribution Contracts provide:

In order to carry out the Project, the HFA [the Authority] is authorized to (a) enter into an Agreement, (b) enter into a Contract, (c) make housing assistant payments on behalf of families, and (d) take all other necessary actions, all in accordance with the forms, conditions, and requirements prescribed or approved by the Government. Provided, however, that the HFA shall take no action which would result in any obligation of the Government beyond that provided in the Government-approved Agreement and Contract. (See, e.g., Mot. Ex. F, § 1.2, Doc. No. 14-7.) In the Authority's view, the fact that it agreed to follow HUD's direction in the Annual Contributions Contracts, and the fact that the Annual Contribution Contracts are referenced in the HAP Contracts, means that Plaintiffs necessarily agreed that the Authority would be free to follow any future dictates of "the Government" (HUD or Congress), even if the subsequent dictates breached the terms of the HAP Contracts.

I am not persuaded that this theory is supported merely from an assessment of the complaint and the contract provisions, at least not on the basis of the Authority's limited legal

---

[8] However, the mere reference to the Annual Contributions Contracts could suggest an assignment of rights as much as it suggests a compromise of Plaintiffs' position. (See, e.g., Section 1.5(b) of the HAP Contracts: "The HFA hereby pledges to the payment of housing assistance payments pursuant to the Contract the annual contributions payable under the [Annual Contributions Contract] for such housing assistance payments.") The point is that the HAP Contracts must be read as a whole and the mere reference to an Annual Contribution Contract does not invite an interpretation that Plaintiffs unconditionally agreed to waive contract rights.

analysis.  In effect, the Authority is arguing that the United States can contract with an agent to have the agent contract with a third party, so that when the United States decides it no longer wants to honor the contractual obligation, the third party will have no remedy.  Hornbook law would suggest, to the contrary, that an agent is not free to breach a contract executed in his own name, simply because he has entered the contract in reliance on promises by a principal and the principal has taken an action that forces a breach.  From the face of the complaint and the face of the HAP Contracts, the Authority is a contracting party, not merely a disclosed agent of HUD. See Restatement (Second) Agency § 323 (concerning agents who are parties to transactions conducted by themselves).  Moreover, with regard to contract frustration based on government regulation or order, it is recognized that, although "[i]t is not necessary that the regulation or order be valid, . . . a party who seeks to justify his non-performance . . . must have observed the duty of good faith and fair dealing . . . in attempting, where appropriate, to avoid its application." Restatement (Second) Contracts § 264 cmt. b.  The Authority may have no independent basis to assert a claim against HUD given the fact that it has not suffered its own injury.  However, having been sued for breach of a contract to which it is a voluntary party, the Authority has recourse against HUD in the form of an action for indemnification.[9]  The obligation of good faith and fair dealing calls upon the Authority to cooperate to secure performance rather than attempt to bar Plaintiffs from any potential recovery based on an alleged impossibility of performance.[10]

---

[9]        At least, the Authority has not demonstrated otherwise in its motion papers.

[10]        In its Reply, the Authority cites a recent decision by the Ohio Court of Common Pleas that is supportive of its position concerning impossibility of performance.  Arlington Hous. Partners, Inc. v. Ohio Hous. Fin. Agency, No. 09CVH07-9859 (Ohio Court of Common Pleas, Franklin Cty. July 2, 2010).  (See Doc. No. 29-1.)  I am not persuaded by this authority, both for the reasons stated above and for the reasons set forth in Plaintiffs' sur-reply (Doc. No. 34 at 3-5 & 8-10.)  The Authority's reply memorandum also introduces a "supervening illegality" concept.  However, the only discussion of this concept reflects that the Authority is still talking about impossibility, or impracticability, of performance based on government regulation.  As stated above, the general rule does not excuse a contracting party from taking those steps that are possible to secure performance.  Moreover, the general rule

Nothing in Section 1.1(f) of the HAP Contracts or in the cited portion of the Annual Contributions Contracts is to the contrary.

2.    *Section 1.1(g) and Section 1.6(a)*

The Authority also relies on sections 1.1(g) and 1.6(a) of the HAP Contracts.  Its position is that it has paid the amounts set by HUD pursuant to these provisions.  (Mot. to Dismiss at 11.) Section 1.6(a) states that "the HFA shall not be obligated to make and shall not make any housing assistance payments under the Contract in excess of the amount per annum stated in Section 1.1g" unless otherwise indicated in Section 1.6(b).  Section 1.6(b) refers to the project accounts and provides that "the maximum total housing assistance payments for any Fiscal Year may exceed the maximum amount stated in paragraph a of this Section to cover increases in Contract Rents or decreases in Family Incomes (see Section 1.9)," to the extent funds are available in the project accounts.  This incorporation of Section 1.9 brings the automatic annual adjustments into the mix and makes Plaintiffs' allegation of breach plausible.

In opposition, Plaintiffs have submitted a declaration and exhibits that evince periodic written amendments of the HAP Contracts which provide amended unit rates and amended annual contract rents in excess of the maximum stated in the original contracts.  (Doc. Nos. 25-1, 25-2.)  The point is that the maximum housing assistance commitments stated in the HAP Contracts are subject to amendment under the terms of the contracts.  It is a plausible inference that a driving factor behind the upward adjustment in the maximum housing assistance commitments is Section 1.9.  For purposes of Rule 12(b)(6), the alleged breach of Section 1.9 of the HAP Contracts states a plausible basis for recovery.

---

stated in the Restatement does not address the present scenario where the regulatory body is attempting to change the playing field of a program in which its own agents, allegedly, have become contractually bound to third parties.

3.      *Summary judgment*

The parties' dispute is obviously one that should be finally determined on the basis of cross motions for summary judgment.  However, the limited contract construction arguments raised by the Authority are not sufficient to call for summary judgment at this time.  A reading of the HAP Contracts demonstrates that Section 1.9 is material to the upward movement of contract rents over time, which supports Plaintiffs' opposition even in the absence of any supplemental evidence demonstrating periodic amendment of contract rents.  For that reason, the Court should not convert the motion into a motion for summary judgment as proposed by the Authority.

4.      *N.B.:  statute of limitations*

There is a statute of limitation issue in this case.  Whatever law might supply the limitations period for a claim of this kind, it appears that the state law limitation period of six years, 14 M.R.S. § 752, corresponds with both the six-year limitation period applicable to claims for review of agency action under the Administrative Procedures Act, <u>Trafalgar Capital Assocs. v. Cuomo</u>, 159 F.3d 21, 34 (1st Cir. 1998), and the six-year limitation period applied by the Court of Federal claims in the context of analogous contract claims against the federal government, <u>Brown Park Estates-Fairfield Dev. Co. v. United States</u>, 34 Fed. Cl. 464, 466-67 (1995) (citing 28 U.S.C. § 2501 and rejecting plaintiff's assertion of the continuing claims doctrine).

## Conclusion

For the reasons set forth above, I RECOMMEND that the Court DENY Defendant Maine State Housing Authority's motion to dismiss (Doc. No. 14.)

NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 19, 2010