UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ONE AND KEN VALLEY HOUSING GROUP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:09-cv-00642-DBH |
| MAINE STATE HOUSING AUTHORITY, | ) ) ) | |
| Defendant and Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| SECRETARY, UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | ) ) ) ) | |
| Third-Party Defendant | ) | |

**RECOMMENDED DECISION**

Each of the plaintiffs in this action is a limited partnership that owns a multifamily,

"Section 8" housing project.  Each plaintiff is party to a Housing Assistance Payments Contract

("HAP Contract") with the defendant and third-party plaintiff, Maine State Housing Authority.

For each of these contracts, the Authority is party to a related Annual Contributions Contract

("ACC") with the third-party defendant, the United States Department of Housing and Urban

Development.  Plaintiffs have filed a motion for summary judgment on their claims against the

Authority for breach of contract (Doc. No. 90).  The Authority has filed a motion for summary

judgment against Plaintiffs' claims (Doc. No. 88) and a motion for summary judgment against

the Department ("HUD") (Doc. No. 87), which latter motion is contingent upon a lack of

complete success in the motion against Plaintiffs' claims.  HUD has filed a motion for summary

judgment against "Count II and as to limits on damages imposed by the statute of limitations and the 'Overall Limitation' clause in the [Plaintiffs'] contracts with [the Authority]." (Doc. No. 89 at 1-2.) The Court referred the motions for report and recommendation. For reasons that follow, I recommend that the Court grant summary judgment to the Authority and HUD and dismiss Plaintiffs' contract action with prejudice based on Plaintiffs' failure to demonstrate a material breach.

## I. SUMMARY OF THE DISPUTE

The contracts in issue were executed by the parties in the 1970s and are creatures of the federal Section 8 housing program. The Annual Contributions Contracts between the Authority and HUD authorize the Authority to enter into contract with Plaintiffs, to administer housing assistance payments program and contracts locally, and to receive and distribute federal funds to Plaintiffs. Each Housing Assistance Payment Contract ("HAP Contract") between the Authority and a plaintiff has an extended term, in excess of 30-years. The contracts establish certain initial contract rents, to be paid monthly, and formulae for the adjustment of contract rents in the future. The HAP Contracts recognize that Plaintiffs may receive above-market-rate rents in exchange for their role in administering the Section 8 program at the ground level.

In time, Congress recognized that years of automatic increases in contract rents resulted, in some instances, in the payment of contract rents well in excess of prevailing market rates for comparable, non-assisted housing. As a consequence of congressional action in 1994, and related administrative rulings issued by HUD in 1995, Plaintiffs stopped receiving automatic increases in their contract rents and, when they did receive upward adjustments in their contract rents, the adjustment factors were reduced by 0.01 for those units that did not "turn over" from

the prior year. Additionally, the upward adjustments were conditioned on Plaintiffs showing how their contract rents compared to market rents in the area.

The Plaintiffs' action consists of three claims for breach of contract:

Count I, alleging breach based on the Authority's failure to provide annual increases in every year following the 1994 amendment of the Section 8 program;

Count II, alleging breach based on the use of a reduced factor for non-turnover units; and

Count III, alleging breach based on the requirement that Plaintiffs conduct a local rate study to justify an increase in contract rents.

(Compl., Doc. No. 1.) In addition to these claims, the Authority has a third-party claim against HUD for breach of contract and contribution. (Third-Party Compl., Doc. No. 48.)

Through prior recommended decisions and orders adopting the same, the Court has dismissed third-party claims for indemnification and for prospective injunctive/declaratory relief and has ruled that the contract claims are subject to a six-year statute of limitation. (Rec. Dec. on Authority's Mot. to Dismiss and Order Adopting, Doc. Nos. 35/44; Rec. Dec. on HUD's Mot. for Partial Dismissal of Third-Party Compl. and Order Adopting, Doc. Nos. 65/82.)

## II. UNDISPUTED FACTS

Each party has supplied the Court with a statement of material fact in accordance with Local Rule 56. The Authority, in fact, has supplied two; one in support of each of its motions. A review of these four statements reveals a host of redundant background statements related to party identification, the terms of the contracts, statutory amendment of the Section 8 program, and the regulatory notices that resulted from the statutory amendment. While the parties have largely admitted one another's statements on these background facts, it is unproductive to have them repeated in four different statements, each using slightly modified language. I pause to note this only to observe that this is a model case for application of the Court's new Local Rule

56(h), calling for a pre-motion conference to address issues such as these.  Alas, the new rule
was not applicable to the instant motions.  Ideally, the parties could have stipulated to a
preliminary statement on all of the issues listed above and restricted their individual statements
to address other matters.  I begin with a recitation of the undisputed material background facts,
drawing on the parties' statements, but also drawing on relevant statutes, regulations, and the
subject contracts.

A.      **The Parties**

One and Ken Valley Housing Group owns Island Apartments, a multifamily rental
property in Fairfield.  Two and Ken Valley Housing Group owns Lisbon Senior Village
Apartments, a multifamily rental property in Lisbon.  Three and Ken Valley Housing Group
owns Meadowbrook Apartments, a multifamily rental property in Livermore Falls.  Five and
Ken Valley Housing Group owns Sherwood Forest Apartments, a multifamily rental property in
Skowhegan.  Six and Ken Valley Housing Group owns Washington House Apartments, a
multifamily rental project in Bath.

The Maine State Housing Authority is a state agency created by Maine law, exercising
powers and duties set forth in Maine law.  30-A M.R.S. §§ 4722, 4741.  The Authority
participates in the federal Section 8 housing program as a "public housing agency" and primarily
serves the role of contract administrator.

The Department of Housing and Urban Development (HUD) is an executive department
of the United States Government, headed at present by Secretary Shaun Donovan.  5 U.S.C. §
101;  42 U.S.C. § 3532.  The Congress established HUD for multiple purposes, including to

administer "the principal programs of the Federal Government which provide assistance for housing and for the development of the Nation's communities." 42 U.S.C. § 3531.[1]

## B.      The Section 8 Housing Assistance Payments Program

Among the programs administered by HUD is the "Section 8" housing program codified in Chapter 8 of Title 42 of the United States Code.  The Section 8 program exists to, among other things, "assist States and political subdivisions of States to address the shortage of housing affordable to low-income families."  42 U.S.C. § 1437.  This objective is addressed primarily "through the use of a system of housing assistance payments," 24 C.F.R. § 883.101(a), funded by the federal government, 42 U.S.C. § 1437f(a).  The Section 8 program authorizes the Secretary "to enter into annual contributions contracts with public housing agencies pursuant to which such agencies may enter into contracts to make assistance payments to owners of existing dwelling units in accordance with this section."  Id. § 1437f(b).

Each plaintiff participates in the Section 8 program.  For each housing project owned by one of the plaintiffs, there are two related contracts:  an annual contributions contract (ACC) between HUD and the Authority, which contract references the specific housing project, and a housing assistance payments contract ("HAP Contract") between the Authority and one of the plaintiffs, which contract is also specific to the project.[2]  These contracts set forth how low-income housing assistance will be delivered in these projects.  Both the ACCs and the HAP Contracts were drafted by HUD.  Plaintiffs are careful to assert that they are entitled to Section 8

---

[1]      In addition to the legal citations, see, generally, Pls. Statement ¶¶ 1-5, 7-8, Doc. No. 90-1;  Authority Statements ¶¶ 1-4, Doc. Nos. 91 & 92;  HUD Statement ¶¶ 1-11, Doc. No. 89-1.

[2]      Plaintiffs' contracts were executed between 1976 and 1979.  Plaintiffs were not party to the original HAP contracts, but purchased the subject projects in 1988 or 1989.  Plaintiffs are successors-in-interest to rights arising from the contracts based on assignments approved by HUD and the Authority.  Authority Statement ¶¶ 8, 12, 14, 17, 20, 23, 27, 30, 33, 36, 39, 53-57.  Plaintiffs acquired the properties with assistance in the form of mortgage financing from the Authority, but refinanced with another lender in 2002.  Id. ¶ 42;  Klebanoff Decl. ¶ 3, Doc. No. 97-5.

revenue pursuant to their HAP Contracts and not, technically, pursuant to "the program" as it currently exists in federal law and regulations.  (E.g., Pls. Response to Authority's Statement ¶ 42, Doc. No. 98.)

**C.    The Contracts**

Plaintiffs agree that the contracts are the best source to determine the material terms, rather than the statements offered by the parties.  (E.g., id. ¶¶ 79-81.)  Particulars of the contracts follow, for ease of reference.

"Island Apartments," Fairfield, Maine (One and Ken Valley)

ACC (Doc. No. 14-7)[3]
HAP Contract (Doc. No. 14-2)
Anniversary date:  May 11
Terminated May 11, 2009 (*renewed on new terms*)

"Lisbon Senior Village," Lisbon, Maine (Two and Ken Valley)

ACC (Doc. No. 14-9)
HAP Contract (Doc. No. 14-3)
Anniversary Date:  Dec. 30
Continuing through 40-yr. term ending Dec. 30, 2017

"Meadowbrook Apartments," Livermore Falls, Maine (Three and Ken Valley)

ACC (Doc. No. 14-10)
HAP Contract (Doc. No. 14-4)
Anniversary Date:  Sept. 19
Continuing through 40-yr. term ending Sept. 19, 2018

"Sherwood Forest Apartments," Skowhegan, Maine (Five and Ken Valley)

ACC (Doc. No. 14-11)
HAP Contract (Doc. No. 14-5)
Anniversary Date:  December 30
Continuing through 37.5-yr. term ending approx. June 30, 2014

---

[3]     These contracts can be found elsewhere on the docket, including as exhibits to Plaintiffs' Statement.

"Washington House Apartments," Bath, Maine (Six and Ken Valley)

> ACC (Doc. No. 14-12)
> HAP Contract (Doc. No. 14-6)
> Anniversary Date:  May 16
> Continuing through 36-yr., 5-mo. term ending approx. October 16, 2013

## 1.    *The Annual Contributions Contracts* [4]

The ACCs begin by identifying the project in question and stating that the HFA [Authority] proposes to enter into a HAP contract.  The ACC itemizes the number and size of the residential units to receive the subsidy and states:  "The HFA shall not enter into any Agreement or Contract or take any other action which will result in a claim for a total Annual Contribution in respect to the Project in excess of the maximum amount stated in Section 1.4(a)."  (ACCs § 1.1.)  The ACCs expressly authorize the HFA to enter into contract, make housing assistance payments on behalf of families, and take other necessary actions, "[p]rovided, however, that the HFA shall take no action which would result in any obligation of the Government beyond that provided in the Government-approved Agreement and Contract."  (Id. § 1.2.)

After setting out the term of the contract, the ACCs describe the annual contributions that the Government agrees to provide.  (Id. §§ 1.3, 1.4.)  The Annual Contributions section states that the "Government shall not be obligated to make any Annual Contribution or any other payment with respect to any Fiscal Year in respect to the Project in excess of" a specified dollar amount per year, described as the "Maximum ACC Commitment."  (Id. § 1.4(a).)  "Subject to the Maximum ACC Commitment, the Government shall pay for each Fiscal Year an Annual Contribution to the HFA in respect to the Project in an amount equal to the amount of housing

---

[4]     Much of the ACC language related here is cited by the Authority (Authority Statement Against Pls. ¶¶ 78-84, Doc. No. 91), but not all.  The movement of money from HUD to the Authority and then from the Authority to Plaintiffs, is also indicated in the Authority's statements (e.g., id. ¶¶ 58-59).  Plaintiffs admit that the Authority receives its money from HUD (Pls. Response ¶ 58, Doc. No. 98), but deny the statement that they then receive payment from the Authority, presumably because the statement says that the payments are made "pursuant to HUD regulations and the HAP Contracts" and not simply pursuant to the HAP Contracts (id. ¶ 59).

assistance payments payable during each Fiscal Year . . . by the HFA pursuant to the Contract, as authorized by Section 1.2 . . ." (<u>Id.</u> § 1.4(c).)  Section 1.2 authorizes the HFA to contract with the project owner "in accordance with the forms, conditions and requirements prescribed or approved by the Government."  (<u>Id.</u> § 1.2.)

The ACC does not state that the project will receive the maximum ACC commitment every year.  Rather, housing assistance payments are made in relation to, among other variables, the amount of assistance provided to low-income families occupying the identified units, which is governed by certain "schedules and criteria established by the Government."  (<u>Id.</u> § 2.3(c).)  Periodic payments of annual contributions from the Government to the HFA are based on estimates prepared by the HFA.  (<u>Id.</u> §§ 1.4, 2.11.)  The Government sets aside additional funds in a project account, allowing for an increase in the Government's periodic contribution payment to the HFA should the HFA's estimate of need increase.  (<u>Id.</u> § 1.4(d)(1).)  However, if the HFA's estimates come to exceed "the Maximum ACC Commitment *then in effect*," the ACC provides that "the Government shall, within a reasonable period of time, take such additional steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance, including . . . 'the reservation of annual contributions authority for the purpose of amending housing assistance contracts or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts.'"  (<u>Id.</u> §§ 1.4(d)(2) (emphasis added).)  The provisions of subsection (d)(1) and (d)(2) are in place, according to the ACCs, "[i]n order to assure that housing assistance payments will be increased on a timely basis to cover increases in Contract Rents or decreases in Family Incomes."  (<u>Id.</u> § 1.4.)

Section 1.6 of the ACC provides for "periodic adjustment of contract rents" as follows: "The Contract may provide for periodic adjustments in the Contract Rents chargeable by the

Owner and commensurate increases in amounts of housing assistance payments, in accordance with applicable Government regulations, up to the Maximum ACC Commitment."

Pursuant to the ACC, the HFA maintains depositary agreements with one or more banks and must deposit all funds received from the Government pursuant to the ACC with the depositary. The HFA may only make withdrawals for "payments pursuant to the [HAP] Contract" and for "other purposes specifically approved by the Government." (Id. § 2.14(a), (c).)

The ACC has a default section. (Id. § 2.16.) The section describes, among other things, the rights of the project owner in the event of a default by the HFA under the HAP Contract. (Id. § 2.16(a)(1).) The section also describes the rights of the Government if the HFA defaults under either the ACC or the HAP Contract. (Id. § 2.16(b)(1).) The default section does not posit a default on the part of the Government. However, it does state that the owner may "proceed against the Government by suit at law or in equity," but only upon a determination by the Government that there exists a "Substantial Default." (Id. § 2.16(a)(3).) Though I have included a reference to this section, Plaintiffs have not relied on the default provision of the ACC.

## 2. *The Housing Assistance Payments Contracts* [5]

In each HAP Contract, the owner promises that the contract units will be leased to eligible lower-income families for private dwellings. (HAP Contracts § 1.3a.) The Authority promises to "make housing assistance payments on behalf of Families for the Contract Units, to enable such Families to lease Decent, Safe, and Sanitary housing." These payments "shall equal the difference between the Contract Rents for units leased by Families and the portion of such

---

[5]    See, generally, Pls. Statement ¶¶ 15-16; HUD Statement ¶ 39; Authority Statement Against HUD ¶¶ 65-71; Authority Statement Against Pls. ¶¶ 65-71.

rents payable by Families as determined by the Owner in accordance with schedules and criteria established by the Government."  (Id. § 1.3b(1).)

While the Authority promises to make payments equal to the difference between contract rents and the family contributions, it does not pledge any state revenues, only federal contributions received through the ACCs.  Each HAP Contract references the corresponding ACC Contract expressly, in the heading, in its preliminary recitals (§ 1.1f, g), and in a section labeled "Annual Contributions Contract" (§ 1.5).  At section 1.1g, the HAP Contract specifies the "Maximum Housing Assistance Commitment" and both cross references the ACC and incorporates that dollar amount stated therein.  Sections 1.5 and 1.6 describe the relationship between the HAP Contract and the ACCs and describe *the Government's* obligation to amend the maximum contribution stated in the HAP Contracts based on certain requirements.  In its opening recitals, the HAP Contract clearly identifies "the United States of America acting through the Department of Housing and Urban Development" as "the Government."

     1.5     ANNUAL CONTRIBUTIONS CONTRACT.

     a.     Identification of Annual Contributions Contract.  The HFA has entered into an Annual Contributions Contract with the Government, as identified in Section 1.1(f) under which *the Government will provide* financial assistance to the HFA pursuant to section 8 of the Act for the purpose of making housing assistance payments.  A copy of the ACC shall be provided upon request.

     b.     HFA Pledge of ACC Payments.  The HFA hereby pledges to the payment of housing assistance payments pursuant to this Contract *the annual contributions payable under the ACC* for such housing assistance payments.  The HFA shall not, without the consent of the Owner, amend or modify the ACC in any manner which would reduce the amount of such annual contributions, except as authorized in the ACC and this Contract.

     c.     Government Approval of Housing Assistance Payments Contract.  The approval of this Contract by the Government signifies that the Government has executed the ACC and that the ACC has been properly authorized; *that the faith of the United States is solemnly pledged to the*

*payment of annual contributions pursuant to said ACC; and that funds have been obligated by the Government* for such payments to assist the HFA in the performance of its obligations under the Contract.

(HAP Contract § 1.5 (emphasis added).)

### 1.6 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT

a. <u>Maximum Housing Assistance Commitment.</u> *Notwithstanding any other provisions of this Contract* (other than paragraph b of this Section) or any provision of any other contract between the HFA and the Owner, *the HFA shall not be obligated to make and shall not make any housing assistance payments under this Contract in excess of the amount per annum stated in Section 1.1g*; Provided, however, that this amount shall be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of the ACC or this Contracts (except reductions in Contract Rents pursuant to Section 1.9e(1)).

b. <u>Project Account.</u> As provided in the ACC, in order to assure that housing assistance payments will be increased on a timely basis to cover increases in Contract Rents or decrease in Family Incomes:

(1) A Project Account shall be established and maintained, *in an amount as determined by the Government* consistent with its responsibilities under section 8(c)(6) of the Act, out of amounts by which the Maximum ACC Commitment per year . . . exceeds amounts paid under the ACC for any Fiscal Year. . . . To the extent funds are available in said account, the maximum total annual housing assistance payments for any Fiscal Year may exceed the maximum amount stated in paragraph a of this Section to cover increases in Contract Rents or decreases in Family Incomes (see Section 1.9). Any amount remaining in said account after payment of the last housing assistance payment with respect to the project shall be applied by the Government in accordance with law.

(2) Whenever *the Government approved* estimate of the required Annual Contribution exceeds the Maximum ACC Commitment then in effect . . . and would cause the amount in the Project Account to be less than an amount equal to 40 percent of such Maximum ACC Commitment, *the Government shall*, within a reasonable period of time, *take such additional steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance* including (as provided in that section of the Act) "the reservation of annual contributions authority for the purpose of amending housing assistance contracts or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts."

(HAP Contract § 1.6 (emphasis added).)

Section 1.7 explains that housing assistance payments are paid to the owner "for units under lease by Families in accordance with the Contract." These payments "cover the difference between the Contract Rent and that portion of said rent payable by the Family as determined in accordance with the Government-established schedules and criteria." (Id. § 1.7a(1).) Changes in family income, family composition, and other factors affecting the resident families will result in a change in the amount of housing assistance payments. (Id. § 1.7a(2).) Vacancies also reduce the amount of housing assistance payments, limiting payment to 80 percent of contract rent for up to a 60-day vacancy. (Id. § 1.7b, c.)

Finally, for present purposes, Section 1.9 describes the mechanism for automatic annual adjustment of contract rents,[6] and imposes an overall limitation on the same:

1.9    RENT ADJUSTMENTS.

a.    Funding of Adjustments.  Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this section up to the maximum amount authorized under Section 1.6 of this Contract.

b.    Automatic Annual Adjustments.

(1)    Automatic Annual Adjustment Factors will be determined by the Government at least annually;  interim revisions may be made as market conditions warrant.  Such Factors and the basis for their determination will be published in the Federal Register.  These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

---

[6]    Section 1.1g also provides for increased payments, but its language does not apply to the claim presented by Plaintiffs:  "This amount shall be subject to increase pursuant to . . . Section 1.9e(3) of this Contract, as appropriate."  (HAP Contract § 1.1g.)  As for the reference to Section 1.9e(3) of the HAP Contract, that section provides a basis for increase in relation to the "actual cost of permanent financing," something that is unrelated to Plaintiffs' case.  The language replaced by the ellipses references "Section 1.5e(2) or 1.5f(3) of the Agreement," but "the Agreement" is a reference to a document that is not before the Court, presumably a prior agreement to enter into the HAP Contracts.  The ACCs do not include a Section 1.5e(2) or a Section 1.5f(3).

> (2)     On each anniversary date of the Contract, the Contract Rents shall
> be adjusted by applying the applicable Automatic Annual
> Adjustment Factor most recently published by the Government.
> Contract Rents may be adjusted upward or downward, as may be
> appropriate;  however, in no case shall the adjusted Contract Rents
> be less than the Contract Rents on the effective date of the
> Contract.
>
> . . .
>
> d.     <u>Overall Limitation.</u>  Notwithstanding any other provisions of this
> Contract, adjustments as provided in this Section shall not result in
> material differences between the rents charged for assisted and
> comparable unassisted units, as determined by the HFA . . .; provided, that
> this limitation shall not be construed to prohibit differences in rents
> between assisted and comparable unassisted units to the extent that such
> differences may have existed with respect to the initial Contract Rents.

(<u>Id.</u> § 1.9 (emphasis added).)

## D.     **Pre-1994 Rent Adjustments** [7]

Pursuant to Section 1.9b(1) of the HAP Contracts, contract rents are to be adjusted

annually by automatic application of "automatic annual adjustment factors" (AAAFs).  These

factors have been published in the Federal Register on an annual basis.  (<u>See</u>, <u>e.g.</u>, Section 8

Housing Assistance Payments Program—Contract Rent Annual Adjustment Factors, 24 C.F.R.

Part 888 (Apr. 26, 1994), 21862-64 (Doc. No. 95-1).)  Through 1994, the Authority would grant

rent increases to Plaintiffs on an annual basis by multiplying contract rents by the applicable

factor found in the Federal Register.[8]  Throughout the 1980s, the Authority did not conduct any

rent comparability studies.  In 1989, HUD directed the Authority to not perform comparability

---

[7]     Pls. Statement ¶¶ 17-21;  Authority Statement Against HUD ¶¶ 72, 73;  Authority Statement Against Pls.
¶¶ 72, 73.

[8]     The factors are region-specific and vary depending on whether utilities are included in the rent.  For
example, the April 1994 factors for HUD Region I (including Maine), metropolitan were 1.010 (utility included) and
1.006 (utility excluded), and non-metropolitan were 1.010 (utility included) and 1.005 (utility excluded).  24 C.F.R.
§ Part 888, 21843-44, 21862.  Some of the factors published for 1994 are less than 1.0 (though not in Region I).

studies while HUD prepared new regulations.  That directive grew out of the following

developments:

> In the early 1980s, HUD began to conduct "comparability studies" in those
> markets in which it believed automatic adjustments to assisted units had resulted
> in materially higher rents than those for comparable unassisted units.  See
> Cisneros v. Alpine Ridge Group, 508 U.S. 10, 14 (1993).  HUD would select
> three to five unassisted units it considered comparable to a given assisted unit and
> use the rents of the former to test whether rents for the latter should be capped.
> Id.  After landlords successfully contested this action by HUD in a court of
> appeals, see Rainier View Assoc. v. United States, 848 F.2d 988 (9th Cir. 1988),
> Congress enacted an amendment to the Housing Act explicitly authorizing HUD
> to use comparability studies prospectively to limit automatic annual adjustment
> factor increases.  Department of Housing and Urban Development Reform Act of
> 1989, Pub. L. No. 101-235, § 801(c), 103 Stat. 1987, 2058 (1989).  The Supreme
> Court subsequently held that the 1989 amendment did not constitute a breach of
> the owners' HAP contracts because those contracts authorized HUD to conduct
> comparability studies and use those studies to limit increases in rent adjustments.
> Cisneros, 508 U.S. at 21.

Haddon House Assocs., LLC v. United States, 92 Fed. Cl. 8, 12 (2010).

One of the objectives of the 1989 Reform Act was to establish a standard for how HUD

could devise a "modified annual adjustment factor" based on "comparability studies" for a

geographical area smaller than the otherwise applicable AAAF areas, including project-specific

factors.  Pub. L. No. 101-235 § 801(c), 103 Stat. 1987, 2058 (1989).  Under this provision, a

project owner subject to a determination that the published AAAF would yield a material

difference between assisted and unassisted rents can request a study to obtain a "modified annual

adjustment."  Id.  In such a case the Secretary is required to "complete and submit to the project

owner a comparability study not later than 60 days before the anniversary date of the assistance

contract under this section," or "the automatic annual adjustment factor shall be applied."  Id.

There is no evidence of any rent comparability studies being performed in regard to

Plaintiffs' projects through 1994 (when Plaintiffs received the AAAF), or thereafter (when

Plaintiffs were denied the AAAF).  To this, Plaintiffs would add the following statement:

Even if it had wanted to do so, however, the reality is that [the Authority] could not have performed any substantive comparability analysis, because [the Authority] had no information about a critical component of that analysis – the "initial difference," referred to in §1.9(d) of the HAP Contracts as the difference between original contract rent and then-existing comparable rents. [The Authority] had no records as to what the "initial difference" was for its Section 8 properties and this was a pre-requisite for invoking the overall limitation provision of the HAP Contract. Owners also had no accurate records of the initial difference.

(Pls. Statement ¶ 21 (citations omitted).) Plaintiffs' assertions that no study could be performed and that the overall limitation could not possibly be invoked are both legal conclusions rather than undisputed facts. This contention is a primary focus of the discussion, below.

**E.      Pre-1995 HAP Contract Amendments**

In the years leading up to 1994, the Authority and Plaintiffs would execute an amendment to the HAP Contracts each time a rent increase occurred. (Authority Statement Against HUD ¶ 76; Authority Statement Against Pls. ¶ 76.) Plaintiffs and HUD admit this statement. The cited deposition testimony relates that these amendments were performed under Section 1.6 of the HAP Contract. The amendments were executed so that the maximum commitment under the HAP Contract might keep pace with the adjustment in contract rents. (Dep. of Maureen Brown at 162-64, Doc. No. 88-4.)

**F.      1994 Amendment of the Section 8 Program** [9]

In 1994, Congress amended Section 8(c)(2)(A) of the Housing Act, 42 U.S.C. § 1437f(c)(2)(A), to modify the manner "under which rents are adjusted . . . by applying an annual adjustment factor." Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act of 1995, Pub. L. No. 103-327, 108 Stat. 2298, 2315

---

[9]      Pls. Statement ¶¶ 22-24; Authority Statement Against Pls. ¶¶ 88-89, 100; Authority Statement Against HUD ¶ 100. HUD denies that Congress reenacted the amendment for 1996 on, noting the absence of any citation to record evidence. Authority Statement ¶ 89; HUD Response ¶ 89, Doc. No. 96. Clearly, the language of the 1994 Amendment remains in Section 8(c)(2)(A) of the Act.

(1994). The amendment resulted in two changes. First, "where the maximum monthly rent . . . exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." Id. Second, "[f]or any unit occupied by the same family at the time of the last annual rental adjustment . . ., 0.01 shall be subtracted from the amount of the factor, except that the factor shall not be reduced to less than 1.0." Id. As initially enacted, said changes were to be effective "only during fiscal year 1995." Id. However, the changes were continually enacted to apply in fiscal years 1996 through 1998, and were made permanent beginning with fiscal year 1999.

G.    **Notice H 95-12** [10]

As part of its implementation effort, HUD issued Notice H 95-12 on March 7, 1995, to interpret and apply the annual rent adjustment directives enacted by Congress. One objective of the Notice was to effectuate the overall limitation clause: "Under this Notice, review of [A]AAFs under the Overall Limitation clause of the HAP Contract would apply to Section 8 . . . Properties where Section 8 rent levels for a unit type presently exceed the published Existing Housing Fair Market Rents (FMR)." (Notice H 95-12 at 1, Doc. No. 89-15.) Where contract rents do not exceed the FMR, the preexisting "method of rent adjustment" was to remain the same. (Id.)

Notice H 95-12 (and subsequent implementing notices issued by HUD) required that if an owner wished to receive an annual rent adjustment, the owner was required to submit an

---

[10]    Pls. Statement ¶¶ 25, 27-29; Authority Statement Against Pls. ¶¶ 90-91; Authority Statement Against HUD ¶¶ 90-91. HUD objects to certain language offered in Plaintiffs' statements and I have attempted to address the objection with my wording.

"Estimate of Market Rent by Comparison" on form HUD-92273 ("Form 92273") at least sixty days before the anniversary date of the owner's HAP Contract, but only if the property's contract rents exceeded the applicable fair market rents (FMRs) published by HUD. Notice H 95-12 directed housing authorities to use ten percent of the initial contract rent as a substitute for the initial difference between contract rents and market rents, "if the owner does not submit evidence of this figure to HUD and the initial difference is not documented in the project file." (Id. at 4.)

Notice H 95-12 additionally addressed the statutory requirement of the 0.01 non-turnover reduction. (Id. at 5-6.) It indicated that contract rents be calculated with a weighted average approach to account for the non-turnover rates. Instead of specific units falling behind in terms of the contract rate because the occupying family was the same from the year before, the increases (turnover and non-turnover) were averaged across units of a given kind and the average rent became the new contract rent for the following contract year for units of the kind.

**H.    Rent Increases and Contract Amendments in 1995 and After** [11]

The Authority has followed HUD's Notice in respect to Plaintiffs' properties from 1995 forward. Plaintiffs did not receive automatic annual adjustments in their contract rents following implementation of the 1994 Amendment under the 1995 Notice, continuing through 2005. In 2005 and after, increases have not been granted at all of the subject projects, but have been granted on some as set forth below.

---

[11]    Pls. Statement ¶¶ 26-27, 30, 33-35; Authority Statement Against Pls. ¶¶ 92-93, 99, 101, 106-118; Authority Statement Against HUD ¶¶ 92-93, 99, 101. Note that Plaintiffs object to the wording offered by the Authority in many of its statements. Plaintiffs have also denied certain statements offered by the Authority in which the Authority cites its answer admitting a fact alleged in Plaintiffs' complaint. I have treated admitted allegations as established facts for summary judgment purposes, contrary to Plaintiffs' request. See, e.g., Authority Statement Against Pls. ¶ 101; Pls. Response ¶ 101 & p.2 n.1, Doc. No. 98; Compl. ¶ 71; Authority Ans. ¶ 71, Doc. No. 45. Several of Plaintiffs' statements have been modified to remove argumentative language. See, e.g., Pls. Statement ¶¶ 29-35.

Had Plaintiffs received adjustments in their contract rents, the applicable AAAFs published by HUD in those years provided separate tables for turnover and non-turnover units. The AAAF for non-turnover units was 0.01 less than the AAAF for turnover units (except no factor was reduced below 1.0). Over time, the weighted average resulting from the 0.01 difference would compound.

The Authority puts forward a number of statements explaining its efforts to obtain some rent increases in Maine starting in 2002, in particular by obtaining permission to use an alternative method of calculating the initial difference. As it stood at the time, according to the Authority, even using ten percent of initial contract rents as the presumptive initial difference, it was not possible for Maine projects to receive rent increases under the 1994 amendments and Notice H 95-12 because Plaintiffs' contract rents were too high in relation to the FMR figures published by HUD. Plaintiffs qualify many of these statements, but admit that, in 2005, the Authority obtained permission from HUD to use a different initial difference calculation method for Plaintiffs' projects and that rent increases were granted in that year.[12] This effort included rent comparability studies performed by the Signal Group on Plaintiffs' projects. Only two of the subject projects received rent increases after 2005. Project specific details follow.

### 1. *Contract Rents and Rent Adjustments, by Property* [13]

Island Apartments (One and Ken Valley)

23 one-bedroom units
1996-2005:    $832
Dec. 2005:    $855
May 2006:    $882
May 2007:    $918
May 2008:    $955

---

[12]    It is unclear whether these adjustments were actually "special additional adjustments" under HAP Contract § 1.9(c), which allows for consideration of certain project expenses that add to a projects operating costs.
[13]    Pls. Statement ¶¶ 1-5, 47, 58, 69, 80, 90.

May 2009:    $988
              May 2010:    $1032
              May 2011:    $1032

     Lisbon Senior Village (Two and Ken Valley)

              20-units, five classes of one-bedroom units and three classes of two-
              bedroom units
              1994-2005    $667-$680 (one-bedroom), $752-$743 (two-)
              Dec. 2005:   $726-$729 (one-bedroom), $807-$815 (two-)

     Meadowbrook Apartments (Three and Ken Valley)

              24 units, two-, three-, and four-bedroom
              1994-2005:   $628 (two-bedroom), $715 (three-), $824 (four-)
              Dec. 2005:   $628 (two-bedroom), $743 (three-), $856 (four-)

     Sherwood Forest Apartments (Five and Ken Valley)

              26 units, one-, two-, and three-bedroom
              1994-2005:   $676 (one-bedroom), $685 or $742 (two-), $757 (three-)
              Dec. 2005:   $682 (one-bedroom), $716 or $783 (two-), $813 (three-)

     Washington House Apartments (Six and Ken Valley)

              53 units, zero-, one-, and two-bedroom
              1996-2005:   $764 (0-bedroom), $852 (one-), $864 (two-)
              Mar. 2005:   $847 (0-bedroom), $943 (one-), $952 (two-)
              May 2006:    $879 (0-bedroom), $976 (one-), $982 (two-)
              May 2007:    $918 (0-bedroom), $1019 (one-), $1027 (two-)
              May 2008:    $954 (0-bedroom), $1060 (one-), $1066 (two-)
              Nov. 2009:   $985 (0-bedroom), $1094 (one-), $1097 (two-)
              Nov. 2010:   $1020 (0-bedroom), $1137 (one-), $1148 (two-)

Note that the Authority does not make full housing assistance payments on vacant units.

(Authority Add'l Statement ¶ 1, Doc. No. 103;  HAP Contract § 1.7(c).)  The Authority observes

that Plaintiffs had vacancies of varying lengths in their projects, something that Plaintiffs do not

deny.  The Authority also flags the fact that Island Apartments has been under a different

contract since May 11, 2009, and that Washington House has been since January 1, 2012.

(Authority Add'l Statement ¶¶ 3-4.)  Plaintiffs maintain that their calculations account for these

other concerns.  (Pls. Reply Statement, Doc. No. 112.)  Plaintiffs' statement also supplies the

applicable AAAFs for the projects in the relevant years, but these are not reproduced here.  (Pls.

Statement ¶¶ 46, 57, 68, 79, 89.)

### 2. *Rent Comparability Study Costs* [14]

Based on the Declaration of Steven Klebanoff[15], Plaintiffs have expended $26,575.00 to

conduct rent comparability studies required by the Authority.

## III. DISCUSSION

There are four motions for summary judgment before the Court.  Plaintiffs seek summary

judgment on their claims against the Authority for breach of the HAP Contracts.  They maintain

that the Authority breached the contracts by failing to automatically adjust rents on an annual

basis and by following, instead, Notice H 95-12;  that application of the non-turnover deduction

to the AAAFs would breach the HAP Contracts;  and that requiring Plaintiffs to submit rent

comparability studies was a breach of the contracts and requires reimbursement.  Plaintiffs seek

to have their current contract rents recalibrated by assuming annual adjustments pursuant to the

published AAAFs and they seek back rents based on these same factors.  Plaintiffs additionally

attempt to demonstrate damages in a sum certain for unpaid rents through November 30, 2011, in

the amount of $823,607.00, plus $513.00 per day, plus another $26,575.00 for their expenditures

on market rent studies.  (Pls. Mot. at 34-36, Doc. No. 90.)  As support for the calculation of back

rents, Plaintiffs cite their "Exhibit 3."  However, it appears that the relevant exhibits are exhibits

13 through 17.  (Doc. No. 90-4.)  Plaintiffs' presentation of their case reflects that their

calculation of contract damages rests heavily, if not entirely, on the legal argument that the 1994

---

[14]     Pls. Statement ¶ 91.

[15]     Mr. Klebanoff is president of Sumner Realty, a general partner of each Plaintiff-partnership.  (Klebanoff
Decl. ¶ 2, Doc. No. 25-1.)

Amendment and HUD's resulting notice served to negate, or nullify, the overall limitation clause.

In its motion papers, the Authority complains that it is caught in the middle of this dispute and that, if it is found liable to Plaintiffs, it is only because it was following directives issued by Congress and HUD. The Authority states that it neither had nor has the authority to grant the desired rent increases because HUD is the party that controls the process. In its view, HUD is necessarily liable to the Authority, but only if the Authority is liable to Plaintiffs. (Authority Mot. Against HUD, Doc. No. 87.) As for liability to Plaintiffs, the Authority maintains that it cannot be liable under the circumstances because it had no choice in the matter and performance as requested was rendered impracticable. Should that argument fail, the Authority disputes Plaintiffs' calculation of damages and maintains that the overall limitation clause sets a cap on any recovery. (Authority Opposition to Pls. Mot., Doc. No. 102.) The Authority takes the position that the HAP Contracts must be read in tandem with the Annual Contributions Contracts and that it is unambiguously stated that the Authority has no independent authority to make payments other than as HUD directs. If impracticability does not suffice as a defense, the Authority further maintains that the overall limitation clause applies, that the non-turnover deduction is not a breach, and that Congress was free to change the playing field by requiring rent comparability studies for rent increases under the circumstances. (Authority Mot. Against Pls., Doc. No. 88.)

HUD requests a summary judgment ruling that dismisses the claim stated by Plaintiffs in Count II (the non-turnover deduction claim), that recognizes a particular application of the statute of limitation, and that enforces the overall limitation clause. HUD requests judgment

against the third-party claim to the same extent as judgment enters against Plaintiffs and in favor of the Authority.  (HUD Mot., Doc. No. 89.)

The following discussion begins with a concern expressed by Plaintiffs related to the law of the case doctrine and then proceeds with an assessment of the core issue of whether Plaintiffs have demonstrated a breach of contract.  The assessment offered herein is that there is no breach on this record.  One reason for this is that the duty allegedly breached was not a duty owed by the Authority.  The other reason is that, even if the duty is owed by the Authority, Plaintiffs have failed to demonstrate a material breach.  Because there is no demonstrated breach, this recommendation does not ultimately reach the impossibility/impracticability doctrine.

**A.**     **Law of the Case**

This case commenced with a jurisdictional tight-rope show that took place in relation to the Authority's motion to dismiss.  As part of that show, the Authority argued that "the face of the complaint and the referenced contracts establish there is no breach."  (Def.'s Mot. to Dismiss at 9, § III, Doc. No. 14.)  The Authority's position was that the Court could simply review the unambiguous language of the HAP Contracts and the Annual Contributions Contracts, observe that they cross-reference one another, and conclude that certain provisions made it clear that the Authority had not breached any duty described in the HAP Contracts because all of the critical duties were reposed in HUD.  (Id. at 9-10.)  Additionally, in a reply memorandum, the Authority introduced the idea that, even if a breach occurred, the Authority was excused from liability because congressional amendment of the Section 8 program and HUD's related regulatory measures made contract performance impossible.  (Doc. No. 29 at 3-4, § II.)  In the Recommended Decision on the Authority's motions to dismiss, I recommended that the Court

reject these arguments. (Doc. No. 35 at 23-24.) Plaintiffs contend that the Court's acceptance of that recommendation should foreclose further consideration of these and other arguments.

As for the Authority's contention that the language of the contracts precludes a finding of breach, the recommendation was that this theory was not "supported merely from an assessment of the complaint and the contract provisions, at least not on the basis of the Authority's limited legal analysis." (Id.) In other words, the recommendation was to leave for another day the question of whether a breach could be established. There is no room for law of the case with respect to the core contract claim. Upon further analysis, I agree with the Authority's core contention that it has not materially breached the HAP Contracts because the contract-payment expectations that Plaintiffs want to have fulfilled are not based on any duty to fund or other performance duty assumed by the Authority.

As for the supervening impracticability or impossibility doctrine, my assessment was as follows:

> In effect, the Authority is arguing that the United States can contract with an agent to have the agent contract with a third party, so that when the United States decides it no longer wants to honor the contractual obligation, the third party will have no remedy. Hornbook law would suggest, to the contrary, that an agent is not free to breach a contract executed in his own name, simply because he has entered the contract in reliance on promises by a principal and the principal has taken an action that forces a breach. From the face of the complaint and the face of the HAP Contracts, the Authority is a contracting party, not merely a disclosed agent of HUD. See Restatement (Second) Agency § 323 (concerning agents who are parties to transactions conducted by themselves). Moreover, with regard to contract frustration based on government regulation or order, it is recognized that, although "[i]t is not necessary that the regulation or order be valid, . . . a party who seeks to justify his non-performance . . . must have observed the duty of good faith and fair dealing . . . in attempting, where appropriate, to avoid its application." Restatement (Second) Contracts § 264 cmt. b. . . . The obligation of good faith and fair dealing calls upon the Authority to cooperate to secure performance rather than attempt to bar Plaintiffs from any potential recovery based on an alleged impossibility of performance.

(Id. at 24 (footnotes omitted).)  In a footnote to the foregoing excerpt, I also wrote that the general rule associated with excusing a contract breach based on impossibility of performance "does not excuse a contracting party from taking those steps that are possible to secure performance" and that, as described in the Restatement, the rule "does not address the present scenario where the regulatory body [HUD] is attempting to change the playing field of a program in which its own agents, allegedly, have become contractually bound to third parties."  (Doc. No. 35 at 24, n.10.)

In the course of briefing the pending motions, Plaintiffs maintain that the foregoing rationale for denying the Authority's motion to dismiss should preclude further consideration of certain arguments advanced in the Authority's summary judgment motion.  (See, e.g., Pls. Consol. Opposition at 15, 16-17, 34 n.20.)  Nothing in the prior Recommended Decision even suggests that the Court should reject the possibility that there was, in fact, no actual breach of contract.  As for the doctrine of impracticability or impossibility (which doctrine assumes the existence of a breach), nothing contained in the current briefs and supplemental citation of authority has changed my view.  However, the issue of the impracticability of performance is moot because there was no breach by the Authority.

Finally, it bears stating that the doctrine of law of the case "directs a court's discretion," but does not limit its power.  Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005).  There is no rule precluding reconsideration of arguments rejected in an interlocutory order on a motion to dismiss.  Perez-Ruiz v. Crespo-Guillen, 25 F.3d 40, 42 (1st Cir. 1994).

**B.      Breach of Contract**

Proof of a breach of contract action consists of three elements:  (1) breach of a material contract term;  (2) causation;  and (3) damages.  Wetmore v. MacDonald, Page, Schatz, Fletcher

& Co., LLC, 476 F.3d 1, 3 (1st Cir. 2007) (citing Me. Energy Recovery Co. v. United Steel Structures, Inc., 1999 ME 31, ¶ 7, 724 A.2d 1248, 1250).  To determine the materiality of the breach, Maine courts use "traditional contract principles," including:  (a) whether a party will not receive a reasonably expected benefit;  (b) whether a party can be compensated for deprivation of the benefit;  (c) whether the breaching party will suffer forfeiture;  (d) whether a breaching party is likely to cure his nonperformance;  and (e) whether the breaching party's conduct "comports with standards of good faith and fair dealing," Acoustic Processing Tech., Inc. v. KDH Elec. Sys. Inc., 697 F. Supp. 2d 146, 154 (D. Me. 2010) (citing Associated Builders, Inc. v. Coggins, 1999 ME 12, 722 A.2d 1278, 1280 n.1 and the Restatement (Second) of Contracts § 241 (1981)).  Although materiality is generally a question of fact, "if the question admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law." Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994).

"When interpreting whether a contractual provision was breached, courts must first determine as a matter of law whether the provision is ambiguous." Id. (quoting Halco v. Davey, 2007 ME 48, ¶ 9, 919 A.2d 626, 629).  If there are two or more reasonable interpretations of a provision, or its meaning is unclear, then there is ambiguity. Id.  If there is no ambiguity, then the provision at issue receives its "plain, ordinary, and generally accepted meaning." Id. (quoting Reliance Nat'l Indem. v. Knowles Indus. Servs. Corp., 2005 ME 29, ¶ 24, 868 A.2d 220, 228).  When assessing whether a particular construction proposed by a party is reasonable, the Court should avoid a construction that would render a provision meaningless or mere surplusage. Crowe v. Bolduc, 365 F.3d 86, 97 (1st Cir. 2004);  Richardson v. Winthrop Sch. Dep't, 2009 ME 109, ¶ 9, 983 A.2d 400, 403.  "A contract must be interpreted to effect the

parties' intentions as reflected in the written instrument, construed with regard for the subject matter, motive, and purpose of the instrument, as well as the object to be accomplished." <u>Briggs v. Briggs</u>, 1998 ME 120, ¶ 6, 711 A.2d 1286, 1288-89.

"Contract interpretation, when based on contractual language without resort to extrinsic evidence, is a 'question of law.'" <u>OfficeMax, Inc. v. Levesque</u>, 658 F.3d 94, 97 (1st Cir. 2011). On the other hand, if a material provision of a contract is ambiguous, that ambiguity is typically resolved based on findings of fact. But where there is no genuine factual dispute, the interpretation of a contract remains a question of law for the court. <u>Canal Elec. Co. v. Westinghouse Elec. Co.</u>, 973 F.2d 988, 992 (1st Cir. 1992).

When two different contracts are related, form part of the same transaction or undertaking, include express references to one another, and are executed contemporaneously, there is no rule preventing them from being read harmoniously, as the Authority requests. <u>Kandlis v. Houtari</u>, 678 A.2d 41, 43 (Me. 1996). However, "the doctrine applies primarily in cases of uncertainty and cannot undo plain language which makes perfect sense in context." <u>Happ v. Corning, Inc.</u>, 466 F.3d 41, 46 (1st Cir. 2006) (applying Delaware law but citing the Restatement (Second) of Contracts § 202(2) and 11 R. Lord, Williston on Contracts 30:26, at 239-53 (4th ed. 1999)).

There is some debate in the motion papers about whether, and for what purpose, the Court might look to the language of the ACCs to evaluate the merits of a contract claim based on the HAP Contracts. For example, the Authority points to the ACCs to further bolster its argument that it is not the final arbiter when it comes to how much of a financial commitment the Government will make to Plaintiffs' projects. There is nothing inherently wrong with considering the ACCs to understand the relationship among the parties or their respective

obligations.  The ACCs and the HAP Contracts expressly reference one another.  Plaintiffs understood that they were participating in a federal housing assistance program on contract terms drawn by HUD, and HUD executed an "approved" signature line expressly reserved for it on the face of the HAP Contracts.  In any event, even though the language of the ACCs is there for the Court's consideration, when construing the contractual obligations running from the Authority to Plaintiffs, the material terms are found in both the ACCs and the HAP Contracts, and there is no essential language in the ACCs that is not also found in the HAP Contracts.

Ultimately, the question of contract construction determines the outcome of Plaintiffs' claims.  Although many contract disputes revolve around the interpretation of ambiguous contract language, this dispute does not.  Plaintiffs have not rested their case on an argument that any particular provision is ambiguous and that the ambiguity carries the day for them.  To the contrary, Plaintiffs maintain that the relevant contract language is unambiguous, but that regulatory measures introduced by HUD and applied by the Authority *necessarily* resulted in a breach or repudiation of those unambiguous contract terms.  (E.g., Pls. Mot. at 14, Doc. No. 90; Pls. Consol. Opposition at 11, Doc. No. 11.)  The following discussion explains why the historical facts of record do not support an inference that the Authority committed a material breach of the HAP Contracts, based on (1) a construction of the plain language of the HAP Contracts and (2) based on an assessment of the materiality of Plaintiffs' showing on the issue of breach.

 *1.*  ***The HAP Contracts Do Not Impose the Allegedly Breached Duty on the Authority***

In Count I of their complaint, Plaintiffs allege the following:

66.     Under the HAP Contracts between Plaintiffs and [the Authority], Plaintiffs are entitled, on the anniversary date of each stage of their Contracts, to an annual rent adjustment according to the AAAF published by HUD, in the Contract Rents at Plaintiffs' Properties.

67.     Notwithstanding the terms of the HAP Contracts between Plaintiffs and [the Authority], [the Authority] has not increased the Contract Rents at Plaintiffs' projects annually, as required by the HAP Contracts, since HUD issued Notice H 95-12 on March 7, 1995.  In addition, the increases to the Contract Rents at the Plaintiffs' Properties made by [the Authority] since Notice H 95-12 was issued were for an amount less than the amount to which Plaintiffs were entitled under their HAP Contracts with [the Authority].

68.     [The Authority]'s failure to increase the Contract Rents at Plaintiffs' projects in accordance with the terms of Plaintiffs' HAP Contracts since HUD issued Notice H 95-12 constitutes a breach of the HAP Contracts between Plaintiffs and [the Authority].

With these allegations, Plaintiffs seek to realize the "maximum housing assistance payments commitment" that the most generous reading of the HAP Contracts could possibly provide, assuming that the overall limitation clause were a nullity.  These allegations fail, quite simply, because the Authority has never assumed a contractual obligation to fund Plaintiffs' housing assistance payments under the HAP Contracts.  It has promised only to make payments equal to "the difference between the Contract Rents for units leased by Families and the portion of such rents payable by Families" (HAP Contract § 1.3b(1)), by paying over annual contributions received under the ACC (id. § 1.5b) that "the Government will provide" (id. § 1.5a).   These funds are to be routed through a project account that contains funds "in an amount as determined by the Government" (id. § 1.6b(1)) and subject to "such additional steps authorized by section 8(c)(6) of the Act" that only Congress can fulfill (id. § 1.6b(2)).

As for Plaintiffs' allegation that the Authority administered the HAP Contracts in violation of the terms of the agreement, Plaintiffs' evidentiary presentation fails to reveal that there was any act that the Authority failed to undertake that would have resulted in any of the

rent increases they seek through this action.  In the absence of such proof, Plaintiffs fail to demonstrate a material breach of any performance obligation assumed by the Authority.

Although this recommendation differs from the prior recommendation on the Authority's motion to dismiss, that preliminary assessment was focused on the Authority's assertion of the impossibility doctrine.  While I remain skeptical about the applicability of that doctrine for reasons previously stated, I am persuaded that suits like these are not properly brought against the local housing authority because it has not assumed the contractual obligation allegedly breached, *i.e.*, to make assistance payments other than in the amount allowed and funded by HUD.  Cf. Arlington Hous. Partners, Inc. v. Ohio Hous. Fin. Agency, No. 10AP-764, 2012 Ohio App. Lexis 1263, *23, 2012 WL 1078835, *8 (Ohio Ct. App., Mar. 30, 2012) (finding (1) that "there was no breach because the language of the contract expressly incorporated HUD's regulatory framework, and contemplated that changes in HUD's annual adjustment factors and the manner of their determination would constitute a variable term in the contract" and (2) that "performance under the contract was excused by the doctrine of impossibility.")

### 2.  *A Material Breach is Not Demonstrated*

In their motion for summary judgment, Plaintiffs explain the basis for their action:  "In a series of decisions, the Court of Federal Claims and the federal district courts have concluded that the 1994 Amendments and Notice H 95-12 breached the very rent adjustment provisions that are the subject of this litigation."  (Pls. Mot. at 9, Doc. No. 90 (citing  Park Props. Assocs. L.P. v. United States, 74 Fed. Cl. 264, 272-74 (2006);  Statesman II Apts. Inc. v. United States, 66 Fed. Cl. 608, 615-20 (2005);  Cuyahoga Met. Hous. Auth. v. United States, 57 Fed. Cl. 751, 759-62 (2003);  Cathedral Square Partners Ltd. P'ship v. S.D. Hous. Dev. Auth., No. 1:07-C-4001, 2011 U.S. Dist. Lexis 1703, 2011 WL 43019 (D. S.D. Jan 5, 2011);  Greenleaf Ltd. P'ship v. United

States, No. 08-C-2480, 2010 U.S. Dist. Lexis 104574, 2010 WL 3894126 (N.D. Ill. Sept. 30, 2010).)  Despite the fact that the 1994 Amendment and Notice H 95-12 are identified as essential to the breach in this language, Plaintiffs maintain that the Authority could not simply "determine" that the overall limitation clause applied in a given year, as the HAP Contract language states, but had to "invoke" the overall limitation clause in every year by performing a comparability study on a specific timetable or else the clause would be negated.  (Pls. Mot. at 15-16.)  Thus, Plaintiffs maintain:

    (1)    that HAP Contract Section 1.9b mandated automatic annual adjustments based on the published AAAFs alone (id. at 10-12);

    (2)    that the 1994 Amendment and Notice H 95-12 breached the annual adjustment provision by conditioning rent increases on proof of rent comparability by Plaintiffs (id. at 12);  and

    (3)    that the Authority lost the opportunity to invoke the overall limitation clause in Section 1.9(d) because it failed to determine the initial difference when the contracts were first executed and because it failed to take "affirmative action" each year to "invoke" the overall limitation clause, which provision it describes as "not self-executing" (id. at 14-16).

The Plaintiffs' reasoning relies heavily on decisions issued by the Court of Claims, which reasoning has, generally, been followed by district courts that have considered it.  The argument assumes mandatory regulatory adherence, in all cases, to the Department of Housing and Urban Development Reform Act of 1989, 103 Stat. 2057 (see, supra, Section II.D), notwithstanding the 1994 Amendment (see, supra, Section II.F).  Based on the 60-day rule related to the 1989 Reform Act, which provided "that HUD may limit automatic rent adjustments in the future through the use of independent comparability studies," but required HUD to conduct a study "not later than 60 days before the anniversary date of the assistance contract," or else the "automatic annual adjustment factor shall be applied," Cisneros v. Alpine Ridge Group, 508 U.S. 10, 15 & n.1 (1993), Plaintiffs say the overall limitation is not self-effectuating and is waived if not

invoked, regardless of whether their contract rents were, in fact, materially in excess of rents at comparable, unassisted units.[16]

The 60-day provision remains in the Housing Act to this date.  42 U.S.C. § 1437f(c)(2)(C).  However, due to the 1994 Amendment and subsequent amendments, the Housing Act also states that "where the maximum monthly rent to be adjusted using an annual adjustment factor exceeds the fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent for an unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary."  Id. § 1437f(c)(2)(A).  Faced with these seemingly opposed congressional mandates, HUD issued Notice H 95-12.  In effect, pursuant to the Notice, HUD would use its published figures for regional fair market rents ("FMRs") and the owner of a project with contract rents exceeding the applicable FMR by more than the initial difference would be subject to the burden of coming forth with their own rent comparability studies to challenge application of the overall limitation.  The presumptive "initial difference" measure would be based on ten percent of the initial contract rents.  In other words, whether the burden-shift applies was made a function of a comparison to the FMRs.  Annual adjustments for projects with contract rents materially above the FMRs would be handled under Section 8(c)(2)(A); those with rents at, near, or under would be handled under Section 8(c)(2).

The facts of some of the cases relied on by Plaintiffs involve claims by project owners who were able to demonstrate that their rents were actually at or within the margin of the material difference.  Nevertheless, the courts considering these claims have now come to rule, it

---

[16]    In essence, Plaintiffs are relying on the idea that Congress enhanced their HAP Contracts by passage of the Reform Act of 1989, and that *the Authority* became financially liable for any failure to comply with new statutory promises that *the Government* made.  At the same time, they argue that the 1994 Amendment, which was designed to effectuate the overall limitation, is of absolutely no effect at all.  This is a perplexing approach to contract construction and enforcement.

appears, that the Government's use of Section 8(c)(2)(A) and/or HUD's decision to use FMRs as the divining rod between Section 8(c)(2)(A) and Section 8(c)(2)(C), constitutes a breach of the automatic annual adjustment provision, *as a matter of law*. It is not clear, however, that the apparent development of this rule has occurred in the context of cases in which the plaintiffs have not bothered to make *any* presentation to show that their rents were not actually materially different from unassisted rents. With all due respect to this line of authority, I cannot advise the Court to assume a material breach in this case, as a matter of law, based on the Plaintiffs' factual presentation, which is devoid of any evidence showing the relationship to unassisted rental rates.

 a. The 60-day rule of Section 8(c)(2)(C) is not mandatory in all factual scenarios

As the Supreme Court observed in <u>Alpine Ridge</u>, the overall limitation clause applies "notwithstanding any other provision of [the] Contract" and prohibits a "result" in which there are "material differences between the rents charged for assisted and comparable unassisted units," beyond the initial difference. The overall limitation clause does not assign any burden to either contracting party to conduct any particular kind of study on any particular schedule, but rather assigns to the Authority the task of determining the market rents, subject to HUD approval. (HAP Contract Section 1.9d.) There is no 60-day rule in the HAP Contract. Nor is one found in the FMR provision added to the Housing Act as a consequence of the 1994 Amendment. 42 U.S.C. § 1937f(c)(2)(A). For these reasons, I reject the argument that there was a waiver of the overall limitation based on the Authority's failure to conduct independent market studies under Section 8(c)(2)(C). The 60-day rule is not stated in the HAP Contract and the FMR analysis that arose from the 1994 Amendment placed Plaintiffs in a category different than the one for which the statutory 60-day rule applies. The question is whether the determination to

place Plaintiffs in this category was a reasonable application of the HAP Contracts' overall limitation clause.

        b.  <u>Plaintiffs fail to demonstrate an unreasonable application of the overall limitation clause as to their projects</u>

Whether a given "result" (to use the language of HAP Contract § 1.9d) can fairly be determined by the Authority to be a material difference presents a *question of fact*. This is best illustrated by means of an example. In 1998, the FMRs for Maine were broken into four metropolitan areas and sixteen nonmetropolitan-county areas. Island Apartments, in Fairfield, falls under Somerset County's nonmetropolitan category. The FMR for one-bedroom apartments in Somerset County for 1999 was $381.[17] 63 Fed. Reg. 52858 (Oct. 1, 1998). The undisputed facts in this case reflect that One and Ken Valley's contract rents had grown to $832 in 1999, more than twice the FMR. Even by 2002, Island Apartments received contract rents more than double the then-applicable FMR of $405. 66 Fed. Reg. 50,024 (Oct. 1, 2001). On the basis of the overall limitation language and contract rents like these, and in the absence of any counter-showing by Plaintiffs, I fail to understand how the overall limitation can fairly be regarded as inapplicable, let alone unreasonable as applied.

In <u>Alpine Ridge</u>, the Supreme Court considered whether Congress's authorization of independent comparability studies violated due process by depriving the owners of vested property interests. The Court held that the contracts "do not prohibit the use of comparability studies to impose an independent cap on the formula-based rent adjustment," given the plain language of the overall limitation clause, and the Court highlighted the fact that the overall limitation clauses is expressly operative "notwithstanding any other provision of this Contract." <u>Alpine Ridge</u>, 508 U.S. at 17-18. In the Court's words:

---

[17]       There is no evidence that Plaintiffs ever challenged the FMRs published by HUD or engaged an independent study to prove that the FMRs were unreasonable as applied in their respective market areas.

Thus, we think it clear beyond peradventure that § 1.9d provides that contract rents "shall not" be adjusted so as to exceed materially the rents charged for "comparable unassisted units" on the private rental market—even if other provisions of the contracts might seem to require such a result. This limitation is plainly consistent with the Housing Act itself, which provides that "adjustments in the maximum rents," whether based on market surveys or on a reasonable formula, "shall not result in material differences" between Section 8 rents and the rents for comparable housing on the private market. 42 U.S.C. § 1437f(c)(2)(C) (1988 ed., Supp. III).

Id. at 18-19. It is clear from the Court's holding that the overall limitation clause is not overridden by the automatic nature of the adjustment factors. To the contrary, the Court pointedly noted that "the contract language is plain that *no project owner may claim entitlement to formula-based rent adjustments that materially exceed market rents for comparable units*." Id. at 21 (emphasis added). Additionally, the Court observed that the HAP Contract assigns *to the Government* the discretion to assess material differences, overriding any "contract right to unobstructed formula-based rent adjustments." Id. By logical extension, the Government's use of FMRs to help identify contract rents subject to the overall limitation is perfectly consistent with the HAP Contract, at least in every case in which the Government's use of the FMR divining rod actually identifies contract rents that are materially different from rents received by comparable, unassisted units. It simply is not an accurate statement to say, as the Plaintiffs do, that "MaineHousing is required to grant the full AAAF-based rent adjustment, unless the agency conducted a competent RCS." (Pls. Consol. Opposition at 21.) No one in this case has even suggested that the determination that Plaintiffs' rents exceeded the overall limitation was, in fact, unreasonable or even subject to reasonable dispute. That is a serious evidentiary hole in a contract case that requires evidentiary (*i.e.*, factual) demonstration of a material breach.

c.   Uncertainty over the initial difference does not warrant a ruling barring application of the overall limitation clause

Plaintiffs next argue that the overall limitation simply cannot be operative—no matter what—because the Authority "does not know what the initial difference is."  (Pls. Mot. at 20.) This argument is not persuasive, either.  What the initial difference was is a factual question that is subject to proof and it is not inherently different from other financial questions that are proven through reliable estimation.  See, e.g., Statesman II Apts., 66 Fed. Cl. at 614 & n.9 (reflecting studies by the plaintiffs' expert and opinion evidence of the initial difference despite the passage of roughly 20 years).  Plaintiffs implicitly recognize that an approximation could be achieved because they insist that the ten-percent factor "concocted" by HUD "was manifestly **not** the historical difference."  (Pls. Mot. at 21 (emphasis in original).)  Reasonableness is the usual standard that Courts attempt to apply in cases where estimation is required.  That Plaintiffs insist on a waiver rule designed to nullify an essential contract provision suggests that a reasonable inquiry directed at the "material difference" standard would not bear fruit for them, possibly because their historic contract rents substantially exceeded fair market rents in their areas, or else came to after roughly fifteen years of automatic increases.  Ultimately, unless Plaintiffs make a showing that the overall limitation clause was not reasonably implemented in a given year by reliance on the FMR tables, they fail to raise a genuine issue of breach by the Authority.

Plaintiffs have failed to develop a summary judgment record that would allow the Court to look at any particular year inside the statute of limitation to assess whether a finder of fact could conclude, based on reasonable inference, that one or more of the projects were entitled to an automatic annual increase in rents that would not result in a material difference between a particular project's contract rents and the unassisted market rents in the area, which difference

would not exceed the initial difference received by the original owners in the first contract year. To further illustrate this point, consider the following facts:

The original contract rents at Island Apartments were $426, which resulted in an original maximum commitment of $117,576 (23 apartments x $426 x 12 months). For purposes of this litigation, the "initial difference" between unassisted market rents and contract rents for this property was obviously less than $117,576, but at least as much as $11,757.60 (HUD's ten percent rule). Using HUD's FMR figures for 1999, One and Ken Valley's contract rents in 1999 ($227,148) exceeded the FMR ($105,156) by more than 100 percent of the entire initial contract rents, which obviously does not comport with the overall limitation clause. I have used 1999 figures, which are outside of the statute of limitation period, but the point is that Plaintiffs have made no effort to illustrate how it is that an automatic increase in their rents would not offend the overall limitation's material difference or initial difference standards[18] in any of the years inside the limitation period, whether by reference to the FMRs or to any other reasonable measure of their choosing.

### d. "Determination" and "application" equal "invocation"

The 1994 Amendment extended the FMR into the housing assistance payments program to be used as a yard stick to measure whether contract rents were materially different from the rents at non-assisted units. 42 U.S.C. § 1437f(c)(2)(A). Where contract rents exceed market rents for an existing dwelling unit in the market area, the overall limitation is put in play. Where the overall limitation is in play, the Authority will adjust the contract rents only if the owner demonstrates "that the adjusted rent would not exceed the rent for *an* unassisted unit of similar quality, type, and age in the same market area, as determined by the Secretary." Id. §

---

[18]    The initial difference metric is not necessarily at odds with the material difference metric. Under either metric there is room for above-market rents.

1437(c)(2)(A) (emphasis added).  Whether this congressional calibration of the contract standards resulted in a breach of every HAP Contract in the land that is similar to Plaintiffs' HAP Contracts, is not something that can be determined as a universal proposition, as the materiality of a breach is a question of fact.  On the existing record, Plaintiffs simply fail to demonstrate that there was any objectively reasonable basis to believe that the Plaintiffs' contract rents did not substantially exceed market rents.  Without such a showing, there is an insufficient factual basis for the finder of fact to infer that the Authority's <u>application</u> of the overall limitation resulted in a material breach of contract.  Indeed, Plaintiffs here have not even put forward a showing that <u>application</u> of the overall limitation in any particular year, at any particular property, even presented a close question.

The word "application" in the preceding paragraph might as readily read "invocation." There is a more recent line of case law in this area finding that the overall limitation clause must be "invoked" in a given year to prevent automatic annual adjustments and that the overall limitation clause is negated in cases like this one, where HUD or the housing agency simply refused automatic increases without performing an independent study pursuant to 42 U.S.C. § 1437(c)(2)(C).  <u>See</u> <u>Cathedral Square Partners</u>, 2011 U.S. Dist. Lexis 1703, *34, 2011 WL 43019, *11 (collecting cases).  I have already explained why I think that use of Section 8(c)(2)(C) is mistaken, as far as being applied as an across-the-board legal conclusion.  In fact, it is difficult to conceive of the regulatory changes brought on by the 1994 Amendment as anything other than a wide-scale "invocation" of the overall limitation, as Congress was clearly persuaded that contract rents for a substantial percentage of projects were materially higher than rents in the unassisted market.  Particularly in the circumstances of this case, where there has never been a showing by Plaintiffs that would disprove the material difference, it seems highly indulgent to

negate the overall limitation clause, a clause that applies "notwithstanding" any other contract provision and does not include any language calling for an "invocation" on the Government's part. Moreover, there is an appearance from the factual presentation that the historical administration of Plaintiffs' HAP Contracts proceeded as it did precisely because it was understood by the Authority that Plaintiffs' contract rents materially exceeded market rents. How can the administration of that exact determination be anything other than an "invocation" of the overall limitation clause? But see Park Props. Assocs., 82 Fed. Cl. at 167-173 (Allegra, J.) (contradicting the approach taken in Cuyahoga II, based on an exegesis about conditions precedent and the prevention principle).[19] In my view, the Authority invoked the overall limitation clause.

         e.   Judgment should enter against Plaintiffs and this case should be dismissed

An essential showing of material breach has not been made in this case and summary judgment should enter, therefore, against Plaintiffs' action. Because the third-party action depends on Plaintiffs' success, both the primary action and the third-party action should be dismissed, with prejudice.

---

[19]     In his Park Properties decision, Judge Allegra describes the 1994 Amendment as an act that prevented the occurrence of a condition precedent, but obviously Congress did not "prevent" Plaintiffs' contract rents from being materially different from rents in the unassisted market, if Plaintiffs' rents were already materially different. Paraphrasing Justice Holmes, whom Judge Allegra quotes, neither HUD nor the Authority is a party who, "by his fault, prevent[ed] the other party to a contract from entitling himself to a benefit," because Plaintiffs have never been entitled under the contract to rents materially different from rents in the unassisted market. 82 Fed. Cl. at 171 (quoting St. Louis Dressed Beef & P. Co. v. Maryland Cas. Co., 201 U.S. 173, 180-81 (1906)). Ultimately, it makes little sense to contend that the Government repudiated the contract, id. at 173, when the 1994 Amendment and Notice H 95-12 were designed to effectuate the very result dictated by the overall limitation clause. Perhaps in some cases this did amount to a repudiation, but not in every case as a matter of law.

    The cases relied on by Plaintiffs have also followed the rationale offered by Judge Allegra in the Cuyahoga case. The plaintiff in that case, however, supported its action with studies of "comparable rents plus the initial difference" in the market area, showing that the automatic annual increases would not have exceeded the material difference standard. 57 Fed. Cl. at 758. Judge Allegra went on to explain why he believed a "general breach" was established in that case—based on dicta from Alpine Ridge, which he construed to require a special "invocation" of the overall limitation clause—but there was, nevertheless, a prima facie showing of a material breach. Id. at 760, 780. There is no similar showing here.

## C.    Alternative Recommendations

In the event that the Court disagrees with the foregoing recommendation and decides that Plaintiffs are entitled to recover from the Authority based on a retroactive adjustment in contract rents, the parties' remaining arguments are discussed in brief.

### 1.    *The Non-Turnover Rate is Not an Independent Material Breach*

Congress's introduction of the non-turnover rate for 1995 and after was not in breach of the HAP Contracts.  Plaintiffs argue that the non-turnover rate should not be applied because it reflects "a huge deduction to already limited rent increases, based on a mistaken notion that the cost of operating a unit that does not turn over in a given year is less than the cost of a unit that does turn over."  (Pls. Mot. at 23.)  According to Plaintiffs, it might have been sensible for Congress to increase the AAAF by 0.01 for turnover units, but not to reduce the AAAF for non-turnover units.  (Id.)  Plaintiffs spend several pages providing a picture of the long-term effect that the non-turnover rate has on contract rents, explaining that "these enormous and accelerating reductions necessarily mean that fewer funds were and will be available for property maintenance and improvements to Section 8 buildings, further reducing the amount and quality of housing available for the lower income families."  (Id. at 29.)  These policy considerations do not, in my view, advance the contract claims.  Plaintiffs also argue that the express language of Section 1.9b(1) allows for only two AAAFs:  one for units in which utilities are included in the rent and one for units that leave utility payments to the tenants.  (Id. at 23-24.)  Section 1.9b(1) reads:

> Automatic Annual Adjustment Factors will be determined by the Government at least annually;  interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register.  These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

Contrary to Plaintiffs' contention, the HAP Contract does not impose any restriction on HUD's ability to determine that multiple adjustment factors, or AAAFs, be applied. It simply states that "[f]actors will be determined by the Government" and that they will be reduced "where utilities are paid directly by the Families." The fact that the Contract directs a utility reduction does not mean that it has forbidden any other reduction. Moreover, "the Government" has obviously "determined" that the non-turnover reduction be included in the AAAF and, based on persuasive precedent addressing the legislative history behind the 1994 Amendment, Plaintiffs received sufficient notice of the "basis" for that determination. See Parks Props. Assocs. L.P., 74 Fed. Cl. at 275 ("[T]he contract permits HUD to describe the 'basis' for its determination in either factual or legal terms—as it did here, in indicating that the basis for the lower AAAFs for non-turnover units was the 1994 amendments"); Cuyahoga II, 65 Fed. Cl. at 542 ("Nothing in this language suggests that there will be a single, monolithic factor for all units at a given property or that Congress could not authorize HUD, in determining the AAAF for a given unit, to make a different adjustments for those in which no turnover had occurred."); Greenleaf Ltd. P'ship, 2010 U.S. Dist. Lexis 104574, *18, 2010 WL 3894126, *6 (observing that "nothing in the contract requires factual findings or a demonstration that costs are lower for holdover tenants" and that "the congressional record suggests that HUD did have a factual basis underlying the .01 reduction for Non-Turnover Units"); Cathedral Square Partners Ltd. P'ship, 2011 U.S. Dist. Lexis 1703, *53, 2011 WL 43019, *17 (following Cuyahoga II, Park Properties, and Greenleaf); but see Statesman II Apts. Inc., 66 Fed. Cl. at 625 (concluding that the non-turnover factor could not be applied because HUD did not "publish[] any findings" and "merely adopted the statutory reduction").

## 2. *Assuming the Record Establishes a Breach, Is the Breach Excused?*

The principal assertion in the Authority's motion for summary judgment against Plaintiffs is that it was merely caught in the middle; that, given its status as a "conduit between Plaintiffs and HUD," it "should not be held responsible for a change in law or matters outside of its control." (Authority Mot. Against Pls. at 2, Doc. No. 88.) The Authority argues that Plaintiffs must have understood that, by contracting with the Authority rather than with HUD, they would not have recourse against the Authority if Congress, the "superior sovereign," made changes in the Section 8 program. (Id. at 10-11, citing SC Testing Tech., Inc. v. Dep't of Envtl. Prot., 688 A.2d 421, 424 (Me. 1996); see also id. at 6, citing Restatement (Second) of Contracts § 264 (1981).). With this, the Authority reasserts the impossibility doctrine to, in theory, negate a finding of breach.

The citation to the Law Court's decision in SC Testing does not advance the Authority's point. In that case, the contract in question—actually the agency's request for proposals—provided: "Note: In the event the Maine Legislature repeals all or part of the program, the Department and the State of Maine shall bear no responsibility to compensate the Contractor." 688 A.2d at 423. The parties' contract also included a rider expressing the intention of incorporating the provisions of the RFP. Id. at 424. The Court construed the rider to incorporate the RFP's notice and, on that basis, affirmed the entry of summary judgment. Id. at 427 (Lipez, J., dissenting).

The Court previously considered this argument in conjunction with the earlier recommended decision on the Authority's motion to dismiss. (Oct. 19, 2010, Rec. Dec. at 23-24, Doc. No. 35.) The assessment at that time was that the proper way to address this theory was not to treat the Authority's alleged breach as excused by supervening "impracticability" or

"illegality" or "impossibility," but to recognize that the Authority's third-party action (or a separate, later action for contribution) supplied the means of its performance of the alleged obligation to pay. Additionally, my view was that the Claims Court decisions addressing HUD's direct liability under HAP contracts with project owners was a good indication that HUD is not excused of its housing assistance payment obligations whenever Congress passes a law that frustrates its own contract performance. See, e.g., Cuyahoga I, 57 Fed. Cl. at 767-77 (discussing the unmistakability doctrine at length). If HUD would not be excused of its financial obligations to the Authority, its contractual agent, for actions the Authority undertook at HUD's direction, then, in effect, there would be no reason to treat substitute performance in damages as impracticable. Indeed, HUD does not even contend in its own motion for summary judgment that it would not have contributory liability to the Authority on the third-party claim. I am not persuaded that that analysis was wrong, but believe that the point is moot because there is no breach by the Authority to excuse by application of this common law doctrine.

### 3. The Overall Limitation Clause as a Cap on Damages

Even if the Court concludes that a genuine issue of breach is demonstrated on this record, it does not necessarily follow that the overall limitation would not restrict a damages calculation. HUD asserts that the overall limitation imposes a limitation on expectancy damages, should the Court reach the issue of damages. (HUD Mot. at 18-19 (collecting cases).) Plaintiffs oppose this idea. (Pls. Consol. Opposition at 21-23 (collecting cases).) For reasons already explained, Plaintiffs simply are not entitled to automatic adjustments for contract rents that are materially different from market rents for comparable unassisted units, so any attempt to measure their expectations at the time of contracting would have to consider the overall limitation. See Statesman II, 66 Fed. Cl. at 620-24 (applying the overall limitation clause as a "cap" on

expectancy damages and finding a genuine issue for trial based on the parties' disagreement over the initial difference); Cuyahoga II, 65 Fed. Cl. at 551-52 (considering how to apply the material difference limitation in relation to measuring the plaintiff's "expectancy damages," but doing so where the plaintiff conceded application of the overall limitation); but see Park Props., 82 Fed. Cl. at 169-74 (negating the provision by means of a prevention analysis). [20]

### 4. Calculation Disputes

The Authority asserts that Plaintiffs' presentation fails to make any adjustment for unit vacancies; fails to acknowledge that the contract for Island Apartments was renewed in 2009; and fails to account for certain payments to Washington House. (Authority Opposition to Pls. Mot. at 15-16, Doc. No. 102; Authority Statement of Additional Material Facts in Opposition to Pls. Statement, Doc. No. 103.) In short, it does not appear that there is an undisputed sum certain that the Court might reduce to a finding of fact at present. Although two challenges are limited to specific projects and would not prevent an award for the other projects, the concern over accounting for vacancies, which Plaintiffs do not deny (Pls. Reply to Authority Additional Statement ¶ 2, Doc. No. 112), extends to every project.

---

[20] The plaintiff in the Cuyahoga case was a local housing authority that owned and/or operated its own section 8 housing projects. In a later decision on the plaintiff's damages, Judge Allegra explained how the breach at issue was the sanction of disallowing retroactive rent increases based on a "timely request" rule established in Notice H 95-12, *despite a showing on the part of the plaintiff that it qualified for the adjustments*. Cuyahoga Metro. Hous. Auth. v. United States, 65 Fed. Cl. 534, 539-40 & n.5 (2005) ("Cuyahoga II"). Although Judge Allegra concluded that Congress and HUD flatly "repudiated" the HAP Contracts in 1994 and after, id. at 541, this recommendation rejects the idea that there was necessarily an across-the-board repudiation of the contracts of every project in the country receiving housing assistance payments pursuant to a similarly worded HAP contract. Note, as well, that despite the outcome and analysis in Cuyahoga I, Justice Allegra still treated the overall limitation as operative in the context of calculating contract expectancy damages and considered at some length how it might reasonably be applied, although the plaintiffs there conceded the application of the overall limitation clause. Id. at 543, 549-553. Plaintiffs' insistence that the overall limitation be treated as a nullity begs the question of whether they could possibly prove contract rents that are not materially different from the market rents in their areas. I conclude that this failure of proof runs to the issue of material breach and not just to the issue of measuring damages.

### *5. Statute of Limitation*

In addition to these concerns, there is a legal dispute over the application of the six-year statute of limitation.  (HUD Mot. at 13-18 (collecting cases);  Pls. Consol. Opposition at 23-26 (collecting cases).)  Plaintiffs filed their action on December 28, 2009.  With a statute of limitation cut-off of December 28, 2003, the question is whether Plaintiffs would be entitled to recover unpaid rents under any contract for the period between December 28, 2003, and the contract's anniversary date.  HUD asserts that the claim for any alleged breach would have accrued as of the anniversary date, so that the claim for an automatic adjustment in that year has expired.  If accurate, then this analysis means that the damages for any project would not begin to accumulate until the first anniversary date after December 28, 2003.  Plaintiffs, on the other hand, argue that the right to retroactive readjustment of contract rents is a right to be made whole for the entirety of the limitation period.  This time around, Plaintiffs look to Notice H 95-12 to support their claim, observing that it allows for rent increases on dates other than the anniversary date and that HUD has historically allowed for adjustments to become effective on dates other than the anniversary date.  (Id. at 24 n.13.)

Pursuant to Maine law, a contract claim "accrues at the time of breach."  Dunelawn Owners' Ass'n v. Gendreau, 2000 ME 94, ¶ 11, 750 A.2d 591, 595.  Plaintiffs' alleged right to an automatic annual adjustment arose, by contract, on the anniversary date and, by extension, their related contract claim for denial of the automatic adjustment accrued on that date as well.  Although the regulatory scheme allowed for adjustment on a date other than the anniversary date, that scheme required a request and Plaintiffs have not shown that any resulting adjustment would have been applied retroactively.  Thus, while it is all well and good to enhance the contract terms in Plaintiffs' favor by reference to HUD's regulatory framework, that framework

called for requests and Plaintiffs have not presented evidence of a request made on the anniversary date, or at the end of the "stub period," as they call it, or on any date in between. For this reason, their claims are restricted to the contract provision that calls for automatic adjustment on the anniversary date. The contract claim for automatic adjustment in the stub period accrued outside of the limitation period and is time barred. See Greenleaf Ltd. P'ship, 2010 U.S. Dist. Lexis 104574, *24-25, 2010 WL 3894126, *8; but see Pennsauken Senior Towers Urban Renewal Assocs. v. United States, 83 Fed. Cl. 623, 629 (2008) (ruling otherwise on a motion to dismiss because "HUD contemplated mid-year adjustments to contractual rents under HAP Contracts."). Additionally, the statute of limitation would prevent Plaintiffs from obtaining the adjustments for those years outside of the limitation period in which they were denied. In other words, beyond just losing the "stub period," the Plaintiffs would not be able to calculate their damages based on the notion that the AAAFs for 1995 through 2002 are to be retroactively factored in to determine contract rents in 2004 and after. See Statesman II, 66 Fed. Cl. at 626. For the record, it does not appear that Plaintiffs have attempted to increase their claim based on retroactive application of AAAFs for 1995 through 2005.

## CONCLUSION

For the reasons set forth above, I RECOMMEND that the Court grant summary judgment to the Authority and to HUD and deny Plaintiffs' motion.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

April 17, 2012                               /s/ Margaret J. Kravchuk
                                             U.S. Magistrate Judge